# MISKIMMINS v. SHAVER, SHERIFF.

HABEAS CORPUS — SUCCESSIVE WRITS — APPEAL — JURISDICTION —
      CONTEMPT — REFUSAL OF WITNESS TO ANSWER QUESTIONS.

1.   To authorize an appeal in habeas corpus, the right must be
     conferred by statute.

2.   The habeas corpus act contemplates that the writ shall issue,
     and a hearing be had, when the petitioner shows himself en-
     titled to relief, notwithstanding that the writ may have been
     refused or may have been issued by another judge and upon
     a hearing dismissed.

3.   The clear intent of the statute is to preserve the right to
     repeated applications.

4.   The supreme court and its judges have original jurisdiction
     in habeas corpus, even in a case where upon the same facts, a
     previous hearing has been had in the district court, and the
     petitioner's application denied.

5.   Where the petitioner is imprisoned in execution of a sentence
     alleged to be illegal because of the denial of a constitutional
     privilege, it is the duty of the supreme court to exercise its
     original jurisdiction in the premises, upon application for the
     writ, and to inquire into the legality of the imprisonment, and
     if it be determined to be illegal, to discharge the petitioner.

6.   In such case it is not material whether the order of the com-
     mitting magistrate is subject to review on appeal or error by
     a higher tribunal.

7. Where habeas corpus is an appropriate remedy, it is no objection to the exercise of jurisdiction that a remedy also existed by writ of error, or by some other appellate proceeding.

8. The writ of habeas corpus is not in the nature of, nor is it to be used as a substitute for, proceedings in error. Mere errors of law are not reviewable upon habeas corpus; and a finding or decision of the inferior court, no matter how erroneous, if it does not affect its jurisdiction, is not subject to attack in this collateral proceeding.

9. The office of the writ is to determine the legality of the particular imprisonment; and where the imprisonment is by commitment of an inferior court, the only facts to be considered in determining its legality, are such as are jurisdictional.

10. Where the petitioner is imprisoned for contempt, the acts constituting the alleged contempt are to be examined to ascertain whether, in law, they constitute a contempt, and if they do not, the court was without jurisdiction to imprison, and the petitioner is entitled to be discharged on habeas corpus.

11. In commitments for contempt, and in other cases of alleged illegal imprisonment, the court, on habeas corpus, may inquire into the power of the commiting court to make the order, by investigating the question whether the facts constitute a contempt, or, in any case, whether the facts confer jurisdiction upon the court to make the particular order.

12. To protect a witness from answering upon the ground that his answers may tend to criminate him, it must appear to the court, from the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend that, should he answer, he would be exposed to a criminal prosecution.

13. The court can not compel the witness to disclose what crime the answer would tend to convict him of, as such disclosure would defeat the very object of the constitutional privilege; but it must appear to the court, from the character of the question, and the other facts adduced in the case, that there is some tangible and substantial probability that the answer of the witness may help to convict him of a crime.

14. At petitioner's instance certain parties were charged with obtaining money from petitioner by false pretenses. They were arrested in another State, and returned to this State upon a requisition secured upon the affidavit of petitioner. The

latter failed to appear at their preliminary examination, although duly subpœnaed. Thereupon the prosecuting attorney filed an information charging petitioner with compounding the felony, and he was brought before the magistrate, as a witness in the examination of the other parties, by attachment. He was asked to state from his own knowledge the facts constituting the guilt of the parties arrested at his instance, as aforesaid, and refused to answer on the ground that his answer would tend to criminate him. He was committed for contempt. On habeas corpus, *held*, that it appeared that witness was called upon to testify to the first and essential fact necessary to his own conviction of the crime of compounding a felony, viz: his knowledge of the actual commission of the felony aforesaid, and to supply the proof of the equally essential fact in the prosecution of himself, viz: the commission of the original felony; and he should have been excused from answering. *Held, further*, that it makes no difference that the information against petitioner had been dismissed, as that would in no way interfere with a future prosecution.

15. The principle that evidence obtained from a witness in violation of the constitutional privilege can not be used against him, does not authorize or excuse a violation of the privilege, and is no ground for compelling witness to answer.

16. Previous sworn statements of the witness, in or out of court, do not constitute a waiver of the privilege, and do not deprive the witness of his constitutional privilege, when he thereafter claims it.

17. When the court can determine from the circumstances and nature of the question, that the question is incriminating in character, there is, then, no question of good or bad faith, on the part of the witness, to be considered. It is only where the criminating effect of the question is doubtful, that the motive of the witness may be considered.

18. That the said constitutional privilege may be abused is not an argument which the court may consider, further than to guard against such abuses as far as consistent with the maintenance of the right itself.

[Decided September 18, 1899. Knight, J., dissenting.]

PETITION by John Miskimmins for a writ of habeas corpus.

This is a writ of habeas corpus. The prosecuting attorney of Laramie County upon information furnished him by the plaintiff made complaint before a justice of the peace against one Oliver C. Hough charging him with having obtained the sum of $1,130 from plaintiff by false pretenses. He and one James Raff also charged with the same offense had left this State and gone to the State of Colorado, and the plaintiff made the necessary affidavit to obtain a requisition, and they were arrested and brought back to this State for trial. Upon the preliminary examination the plaintiff was placed upon the witness stand by the prosecution and asked the following questions:

"Q. Did you purchase or attempt to purchase from the defendants, James Raff and Oliver C. Hough, or either of them, a bunch of cattle, or any interest in any cattle, between the first day of July, A. D. 1899, and the 15th day of July, A. D. 1899, or about that time? If so, state the particulars of the purchase or attempted purchase.

Q. If any such purchase or attempt to purchase was made, state where the defendants or either of them stated at the time said cattle were situated, or under whose charge.

Q. If any such purchase or attempt to purchase was made, state fully all the facts and circumstances leading up to the said transaction, and all the facts of the transaction itself.

Q. You may state fully what, if any, admissions the defendants James Raff and Oliver C. Hough alias Clifford W. Lang, or either of them made to you in regard to this transaction, stating the date, time, and place, and who was present if anybody, and all the facts and circumstances of such admissions if any were made.

Q. State fully and particularly what money, if any, was paid either by you or your direction to the defendants or either of them, as purchase price, or on the purchase price, for the cattle, or the interest of the defendants or either of them in the cattle, and all the facts in relation to such payment.

Q. If any purchase or attempted purchase was made, state whether or not you obtained any cattle, by your purchase or attempted purchase and if your answer is in the negative, state fully all you know of the reasons why you did not obtain any cattle, or any interest in any cattle, by your purchase or attempted purchase."

He declined to answer all of them, upon the ground that the answers to them would tend to criminate him. In the meantime the prosecuting attorney had had some difficulty in getting the plaintiff, the prosecuting witness, before the justice to testify in the case, and had filed a complaint against him charging him with compounding the felony with which the defendants were charged. The justice decided that the plaintiff must answer the questions, and upon his continued refusal adjudged him to be in contempt, and committed him to jail until he should consent to answer. The plaintiff then sued out a writ of habeas corpus before Hon. Richard H. Scott, the district judge of the first district. Judge Scott upon the hearing adjudged that the plaintiff was properly imprisoned for his failure to answer, and remanded him to jail. The plaintiff then presented another petition for the writ of habeas corpus to one of the judges of this court who issued it and made it returnable before the supreme court.

*W. R. Stoll* and *R. W. Breckons* for plaintiff.

The petitioner is entitled to his discharge upon habeas corpus, being imprisoned in violation of a constitutional privilege, notwithstanding that he might have instituted proceedings in error from the decision of the district judge refusing to discharge him upon the application made before that court. But no appeal lies from that decision because (1) habeas corpus is not a criminal case, and is therefore not controlled by Sections 3354–3360, Rev. Stat.; (2) it is not a civil case within the meaning of Sections 3126–3151, Rev. Stat.; (3) an order denying writ of habeas corpus is a final order. (11 Ency. Pl. & Pr., 72–79; in re Witter v. Lyon, 34 Wis., 564; in re Day, id., 638; Shannon

v. State, 18 id., 633; State v. Giles, 10 id., 101; in re Fen-
elon, 37 id., 231.) (4) the order was not a court order,
but was made by the district judge in chambers.    Hence
no appeal lies.    (Carper v. Fitzgerald, 121 U. S., 87;
Broadwell v. Com., 32 S. W., 141 (Ky.); in re Perkins, 2
Cal., 424; in re Ring, 28 id., 248;  Hammond v. People,
32 Ill., 446; ex parte Thompson, 93 id., 99; Lambert v.
Barrett, 157 U. S., 697; State v. Brownwell (Wis.), 50 N.
W., 415; in re Juneman (Tex.), 13 S. W., 783.)

No proceeding in error or appeal lies in habeas corpus
unless the statute authorizes it.    This court has jurisdic-
tion to issue the writ regardless of the number of previous
applications.    (Const., Art. 5, Secs. 1, 2, 3; R. S., Sec.
1264; 30 Atl., 910; 2 Cal., 242; 28 id., 248; 32 Ill., 446;
93 id., 89; 9 Ill. App., 523; 3 S. W., 631; 8 Wall., 85;
30 S. W., 666; 40 Tex., 6; 27 Tex., 731; 19 So., 652; 20
Fla., 17; 33 Pac., 957; 35 id., 23; 57 Ill. App., 505.)

It is the province of the court to judge whether any di-
rect answers to the questions that may be propounded will
furnish evidence against the witness.    If such answer may
disclose a fact which forms a necessary essential link in
the chain of testimony, which would be sufficient to con-
vict him of any crime, he is not bound to answer it so as
to furnish matter for that conviction.    In such case the
witness must himself judge what his answer will be ; and
if he say on his oath that he can not answer without
accusing himself, he will not be compelled to answer. (1
Thomp. on Tr., 286; Chamberlain v. Wilson, 12 Vt., 153;
Counselman v. Hitchcock, 142 U. S., 547; ex parte Irvine,
74 Fed., 954; Brown v. Walker, 161 U. S., 591; People
v. Forbes, 143 N. Y., 219; People v. Seaman, 29 N. Y. S.,
329; People v. Mather, 4 Wend., 239; Adams v. Lloyd,
3 H. & N., 351; State v. Edwards, 2 N. & Mc Cord,
376; Poole v. Perritt, 1 Spears, 121; Sanderson's case, 3
Cranch C. C., 638; U. S. v. Burr, 25 F. C., 41; Neale v.
Coningham, 1 Cranch C. C., 76; U. S. v. Moses, id., 170.
U. S. v. Lynn, 2 id., 309; ex p. Clark, 37 Pac., 230; S.
Ry. N. Co. v. Russell, 18 S. E., 40; Stevens v. State, 32

Pac., 350; Minter v. People, 29 N. E., 45; Com. v.
Tridee, 9 N. E., 510; Lombard v. Mayberry, 40 N. W.,
271; South Bend v. Hardy, 98 Ind., 577; Lister v. Baker,
6 Black (Ind.), 439; 19 So., 652; 11 Ia., 469; 9 How.
Pr., 394; 8 Wend., 595; 13 Minn., 249; 15 Ark., 624;
6 Cow., 254; 29 N. H., 280; 1 Cold., 146.

The law presumes that the witness will answer truth-
fully and fully, if he answers at all.   The constitutional
privilege is to be construed liberally in favor of the
privilege.

Compounding of a felony embraces two elements.   (1)
The felony itself.   (2) The compounding.   One charged
with compounding a felony, can not be called upon, as a
witness, to prove the felony.   (U. S. v. Lynn, 2 Cranch
C. C., 309; ex p. Irvine, 74 Fed., 954.)

Previous sworn statements can not operate as a waiver
of the privilege afterward claimed.   (Bellinger v. Peo-
ple, 8 Wend., 595; Cullen v. Com., 24 Gratt., 624; Tem-
ple v. Com., 75 Va., 892; Miller v. State, 11 Lea, 18;
Emory v. State, 78 N. W., 145.)

An order is made in excess of jurisdiction when the
court has no right to enter it.   (59 Cal., 405; 34 Tex.,
668; Church on Habeas Corpus, 318 et seq.; 142 U. S.,
547; 74 Fed., 954; 60 N. Y., 559.)

*H. Waldo Moore*, county attorney, and *Herman E. Well-
nitz*, for respondent.

While the decision on a writ of habeas corpus, inde-
pendently of statutory provisions is not a final judgment,
and therefore not subject to review on a writ of error or
appeal, it is entitled to some consideration on a second ap-
plication and may warrant the refusal of the second.   This
occurs where the case has already been heard upon the
same evidence where the facts and circumstances are the
same.   When this is so, the first judgment will be undis-
turbed.   (Church on Habeas Corpus, 389; 9 Ency. Pl. &
Pr., 1070.)

The supreme court, though it has original jurisdiction in habeas corpus, will not entertain a petition where a like petition has before been presented to a judge of the superior court and refused. (In re Graham, 34 Pac., 931.) The general rule certainly is that evidence given or statements made by a party under compulsion or order of court tending to criminate himself can not be put in evidence on a criminal proceeding against him. (U. S. v. Prescott, 2 Dillon C. C., 405; Green. on Ev., vol. 1, p. 549; Wharton's Crim. Ev. (9th ed.), Section 463; Horstman v. Kaufman, 97 Pa. St., 147; Stewart Rapal je's Witnesses, 269.) There are several rulings to the effect that a witness can not be compelled to give a link to a chain of evidence by which his conviction of a criminal offense can be furthered. This proposition however can not be maintained to its full extent since there is no answer which a witness could give which might not become part of a supposable concatenation of incidents from which criminality of some kind might be inferred. To protect a witness from answering, it must appear from the nature of the evidence which the witness is called to give that there is reasonable ground to apprehend that should he answer he would be exposed to a criminal prosecution. The witness is not the exclusive judge as to whether he is entitled on this ground to refuse to answer. The question is for the discretion of the judge, and in exercising this discretion he must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence. (Wharton's Crim. Ev. (9th ed.), Sec. 466, and note, p. 466; State v. Duffy, 15 Ia., 425; U. S. v. Miller, 2 Cranch, C. C., 247; DeVaughn's case, id., 501; Richman v. State, 2 Ia., 532; Kirchner v. State, 9 Wis., 133; Mahanke v. Cleland, 76 Ia., 401; Com. v. Bell, 145 Pa. St., 387; Com. v. Kimball, 24 Pick., 366; Smith v. People, 20 Ill. App., 591; 29 Ency. of L., 843.)

None of the questions could incriminate the witness, or tend to do so, even had he not filed an affidavit for the requisition. The conduct of the witness shows that he

did not claim the privilege in good faith. The privilege is not intended as a shield for the guilty. The dismissal of the complaint against the witness for compounding a felony discloses that the prosecuting attorney, upon investigation, found that there was no evidence to convict the witness of that crime. It seems to counsel that to establish the doctrine contended for by the petitioner in this case would be to destroy the majesty of the law, disarm the courts of their power, and turn the machinery of the courts over to the witness himself. (1 Mo., 288; 96 Ia., 286.)

The district court and the supreme court having had concurrent jurisdiction, the hearing had before the former court and its judgment operates to deprive the petitioner of the right to apply subsequently to the latter court. Where two courts have concurrent jurisdiction, the court first acquiring jurisdiction retains it until the final determination of the case. (State v. Chinault, 40 Pac., 682; Canal Co. v. Ditch Co., 48 id., 585; Gates v. Bucki, 53 Fed., 969; 12 Ency. L., 292; Wells on Juris., Sec. 156; Ober v. Gallagher, 93 U. S., 199; Ex parte Robinson, 6 McLean, 355; Gould v. Hayes, 19 Ala., 438; Averill v. Hartford, 2 Cal., 308; Beatty v. Ross, 1 Fla., 198; Hardman v. Batterby, 53 Ga., 36; Mail v. Maxwell, 107 Ill., 554; Taylor v. Fort Wayne, 47 Ind., 274; Barkdull v. Herwig, 30 La. An., 618; Winn v. Albert, 2 Md. Ch., 43, 54; Brown v. Wallace, 4 Gill & J., 479, 496; Miller v. County Commrs., 119 Mass., 485; Powers v. City Council, 116 Mass., 84, 86; Canover v. Mayor, 25 Barb., 513; Cooper v. Swamp Co., 2 Murph., 195; Ex parte Bushnell, 8 O. St., 599; R. Co. v. Erie, 27 Pa. St., 380; Clepper v. State, 4 Tex., 242; Thompson v. Hill, 3 Yerg., 167.)

CORN, JUSTICE, (after stating the facts as above).

A number of questions arise in this case, none of which have been passed upon by this court. Some of them

are of serious importance, and, owing to the difference in the habeas corpus statutes in the various States and some conflict in the decisions, of considerable difficulty. Therefore, while the circumstances of the case have urged an immediate decision, we have deemed it better to take sufficient time to give the propositions a careful consideration and endeavor to reach a conclusion which could be relied on as a safe precedent in so serious a matter as the imprisonment of a citizen as a penalty for exercising what he claims to be a constitutional right.

Counsel for the defendant contend that the district judge having adjudicated the question of the legality of plaintiff's imprisonment upon the same facts, this court ought not to again consider it; that the plaintiff might have come to this court by petition in error and should be required to avail himself of that remedy. All the authorities agree that there is no appeal from a hearing upon habeas corpus unless the right is conferred by statute. In many habeas corpus cases, as, for instance, where the custody of children is involved, it is without doubt an appropriate method of obtaining the opinion of the court of last resort. In cases like the present, where the petitioner is imprisoned and other proceedings are awaiting the decision of the questions, the necessary delays incident to a review by petition in error make it subject to serious objections, and if there is no other remedy entirely inappropriate and inadequate. We do not deem it necessary to decide in this case, however, whether proceedings in error are authorized by our statutes. For we think that our habeas corpus act, when considered in connection with the constitutional provisions bearing upon the question, clearly contemplates that the writ shall issue and a hearing be had, when upon the showing of the petitioner he would be entitled to relief, notwithstanding the fact that the writ may have been refused, or may have been issued and afterward dismissed, upon a hearing by another judge. It is said that "by the great preponderance of authority,

the principle of res adjudicata, where not otherwise provided by statute has no application to habeas corpus cases, and a decision on one writ is no bar to the issuance of and proceedings on a subsequent habeas corpus." 9 Enc. Pl. & Pr., 1070. In Ex parte Lawrence, 5 Binney, 304, where the case had already been heard upon a habeas corpus upon the same evidence by the common pleas who remanded the prisoner, the supreme court of Pennsylvania refused to issue a second writ, but say in their decision: "We do not think that the act of assembly obliges this court to grant a habeas corpus, where the case has been already heard upon the same evidence by another court, and we do not think it expedient in this case, because it has already been heard upon the same evidence, and the party is not without remedy, as he may resort to a homine replegiando. The court are not, however, to be understood as saying that they have not authority to issue a habeas corpus in such a case, if they should think it expedient." And this was not a case where the applicant was imprisoned, but involved the question of the right to his freedom of one held as a slave. In a case before Mr. Justice Nelson, at chambers, it was objected that the decision of the circuit court of the United States upon the return of a former writ of habeas corpus remanding the prisoner was conclusive, and a bar to any subsequent inquiry into the same matters by virtue of this writ. But after reviewing the authorities, the justice said: "The decision, therefore, by the circuit court, upon a previous writ of habeas corpus obtained on behalf of the prisoner, refusing to discharge him, will not relieve me from inquiring into the legality of the imprisonment under the order of the commissioner, upon the present application." Ex parte Kaine, 3 Blatchford, 5. And upon a hearing the prisoner was discharged. In People ex rel. Lawrence v. Brady, the relator was arrested upon a warrant of the governor of the State of New York upon the requisition of the governor of Michigan. A writ of habeas corpus was issued out of the supreme court, and upon a demurrer to the re-

turn before the court of oyer and terminer, there was
judgment against the relator and the writ was dismissed.
Afterward another writ of habeas corpus was issued out
of the circuit court of the United States, and there was
judgment against the relator dismissing the writ and re-
manding the relator.   Afterward another writ of habeas
corpus was issued and returned before Mr. Justice Brady
of the supreme court, and there was again judgment dis-
missing the writ and remanding the relator to the custody
of the sheriff.   The proceedings before Judge Brady were
affirmed by the supreme court on certiorari and the writ
of certiorari dismissed.   The court of appeals on error
to the supreme court discharged the relator, and the court
say: " We are of the opinion that the previous adjudica-
tions in proceedings on habeas corpus are no answer to a
new writ issued on the application of the relator.   The
case is not within the principle of Mercein v. The People
(25 Wend., 64) where the controversy related to the right
to the custody of an infant child.   In this case the relator
is restrained of his liberty; and a decision under one writ
refusing to discharge him, did not bar the issuing of a
second writ by another court or officer."   (Referring to
Ex parte Kaine, 3 Blatchford, 1, and the English cases
Ex parte Partington, 13 M. & W., 679, and The King v.
Suddis, 1 East, 306; People ex rel. v. Brady, 56 N. Y.,
182.)   And the point was again decided in the same way
in People ex rel. v. McIntyre, 67 Howard Pr., 362.   It
may be here remarked that in the case of Graham, 7
Wash., 237 (34 Pac., 931), relied upon by counsel for the
respondent, where the supreme court of that State denied
an application because the matter had once been heard
upon habeas corpus before a judge of the superior
court, they, in terms, decide only a question of practice.
While admitting their jurisdiction and conceding that the
practice is different in some States, they hold that the
constitution does not *require* them to take jurisdiction
under such circumstances, and they remit the applicant to
his right of appeal, which seems to be provided for in

that State. And it is to be observed further that, even upon the questions decided, the decision was by a divided court, two out of the five judges dissenting.

Brown on Jurisdiction, the latest text-book to which we have access on the subject, says: "A denial of the petition is not a bar to the second writ; but in some States the petitioner must show whether the question has been passed upon by any of the courts. The doctrine of res adjudicata has no application to this proceeding except where the statute provides for an appeal, which is the case in some States." And in the note he cites Hawes on Jurisdiction, Section 181: "A decison under one writ of habeas corpus refusing to discharge a person restrained of his liberty is no bar to a second writ by another court or officer. In re Perkins, 2 Cal., 424; Ex parte Ellis, 11 Cal., 223-225; Matter of Ring, 28 Cal., 251; Yates v. People, 6 Johns, 416; In re Snell, 31 Minn., 110; Bell v. State, 4 Gill, 303; Ex parte Kaine, 3 Blatchf., 2, 5; Bonnett v. Bonnett, 61 Iowa, 200; Ex parte Foster, 5 Tex. App., 643; Ex parte Robinson, 6 McLean, 356; Ex parte Campbell, 20 Ala., 93; Ex parte Lawrence, 5 Binn., 304; People v. Brady, 56 N. Y., 185. A decision on habeas corpus is not appealable or subject to review; the doctrine of res adjudicata has no application to such a case, but it seems that a discharge under a writ of habeas corpus by a court of competent jurisdiction, being in favor of personal liberty, is final and conclusive, and a rearrest under the same charge is unlawful. McFarland v. Johnson, 27 Tex., 105; Matter of Ring, supra; Lea v. White, 4 Sneed, 73; People v. Fancher, 1 Hun, 28; In re Curley, 34 Iowa, 185; Hammond v. People, 93 Ill., 89; In re Blair, 4 Wis., 526; Perry v. McLendon, 62 Ga., 601; Ex parte Pattison, 56 Miss., 162; Weddington v. Sloan, 15 B. Mon., 152."

Unquestionably the matter may be regulated by statute provided the statutory regulations do not infringe upon the constitutional right to the writ. But the clear intention of our statute is to preserve the right to repeated

applications.    By subdivision 4, of Section 1264, Rev. Stat., it is provided that the petition for the writ must state "that the legality of the imprisonment has not already been adjudged upon a prior proceeding of the same character to the best knowledge and belief of the applicant, or if so previously adjudged upon, setting forth as fully as practicable, the facts of such previous hearing, with a copy of all the papers connected therewith, or a satisfactory reason for the absence of such copy or copies."

If a former adjudication is to bar a second writ, the latter part of the subdivision providing for setting out the facts of such former hearing is useless and absurd, and in reason it must be presumed that the subdivision would end with the requirement that the petition should state that there had been no such former adjudication.    The same considerations apply to subdivision 5 of the same section; "It must also state whether application for the writ has been made to and refused by any court or judge, and if such application has been made, a copy of the petition in that case, with the reasons for the refusal thereto appended, must be produced, or satisfactory reasons given for the failure to do so."    The requirement that the facts of such previous hearing or the reasons for such refusal, must be set out, necessarily implies the power and the duty of the court or judge, to whom the second application is made, to consider and pass upon the facts of such previous hearing or the reasons for such refusal.    These sections are also especially persuasive of this view in connection with the fact that no other method of review is provided for in the act itself.    And this conclusion is further fortified by the fact that the act provides in what cases the writ may be refused, and those in which a former adjudication has been had is not one of them.    But it is permitted to be refused only when the application is made to a more remote court or judge and no sufficient reason stated for not making the application to the more convenient court or judge;

or, when upon the showing of the petitioner the plaintiff would not be entitled to any relief. The statute does not authorize the refusal of the writ in any other cases. The habeas corpus act, in the arrangement of our statutes, is not included in the division of the code of civil procedure entitled "Special Proceedings," nor is it incorporated in the code at all as is done in some of the States. The act, which was adopted under the Territorial government, attempted to confer jurisdiction of the writ also upon the probate judges. They were not ordinarily persons learned, or alleged to be learned, in the law; and a construction of the act which would make their judgments final in so vital a matter, involving the constitutional rights and the personal liberty of the citizen, or at the best, to make a review of their judgments dependent upon the doubtful application of the provisions of the civil code to the subject, would expose the lawmaking power of the Territory to the charge of enacting rash and ill-considered legislation. By Section 3, Article 5 of the constitution, this court has original jurisdiction in habeas corpus, and each of the judges is given power to issue the writ and make it returnable before himself or the supreme court, or any district court of the State, or any judge thereof.

In view of all these considerations; the evident purpose of the constitution that the writ shall be conveniently obtained shown in conferring original jurisdiction upon all courts and judges of the State; the provisions of the statute itself; the office of the writ, to furnish to the citizen summary relief where he is unlawfully deprived of his liberty; the failure of the habeas corpus act to provide for any proceedings in error and the entire inadequacy of such proceedings in many cases; and the prevailing opinion and practice of the courts of the country where the matter is not otherwise regulated by statute; we think the power and duty of this court and its judges to consider such second applications and in proper cases to issue, and have a hearing upon, the writ, can not be seriously questioned.

Moreover, if there should be an exercise of the jurisdiction in any case, it should be in one like this, where the petitioner is imprisoned in execution of a sentence, claimed to be illegal because of a denial of a constitutional privilege.    Brown on Jurisdiction above quoted further says: "The Constitution of the United States provides * * * that no person shall be subject for the same offense to be put twice in jeopardy of life and limb; nor be compelled to give evidence against himself.    Each State constitution has similar provisions; and, if not, the United States Constitution would be binding on the courts, and a trial by a different method than that prescribed by it would be a nullity and the judgment void.    The refusal of the court to grant each of the rights above enumerated or all of them goes to the jurisdiction; and if the court has jurisdiction to try the action, it seems to lose jurisdiction once acquired, by a disobedience of the mandates of the constitution; or, rather, the trial ceases to be a legal trial by a deviation from this course.    Therefore, when any constitutional right or immunity of a person is violated, the judgment of the court is void.    The Supreme Court of the United States, in a recent case, say: " It is difficult to see why a conviction and punishment under an unconstitutional law is more violative of a person's constitutional rights than an unconstitutional conviction under a valid law."    Under this rule if a court errs in assuming jurisdiction where it does not possess it, or in interpreting a constitutional immunity or right secured thereby against the prisoner, or in refusing him a constitutional right, the jurisdiction over him ceases and its acts are not simply erroneous, but void.    Therefore, it may be laid down as a rule of law, that the error of a court in construing any constitutional immunity or right in a criminal case against the accused is as fatal to the judgment as assuming jurisdiction originally where the court had none.    Error in either case destroys the power to render any valid judgment, and if rendered it is not simply erroneous, but void."    Brown on Jurisdiction, Sec. 97.    This statement of the law seems to be applicable equally to a witness im-

prisoned in denial of his claim of a constitutional right, for he is the defendant in the contempt proceedings.

There was formerly much controversy whether, and to what extent, the judgment of a court imprisoning a person for contempt could be collaterally attacked by means of the writ of habeas corpus.

The writ is not in the nature of, nor is it to be used as a substitute for, proceedings in error. A finding or decision of the inferior court, no matter how erroneous, if it does not affect its jurisdiction, is not subject to attack in this collateral proceeding. The office of the writ is to determine the legality of the particular imprisonment, and the facts to be considered in determining that question are jurisdictional facts. If upon a consideration of such facts, it appears that the court exceeded its jurisdiction in making the order, the petitioner will be discharged upon habeas corpus, and it is not material that the questions might have been brought to this court by petition in error. In re Boulter this court issued the writ and carefully considered all the points presented, although, as the court say, "They might all have been raised by proceedings in error without resorting to habeas corpus." 5 Wyo., 329. The distinction is tersely stated in Neilson, Petitioner, 131 U. S., 184. "The distinction between the case of a mere error in law and of one in which the judgment is void is pointed out in ex parte Siebold, 100 U. S., 371, 375, and is illustrated by the case of ex parte Parks as compared with the cases of Lange and Snow. In the case of Parks there was an alleged misconstruction of a statute. We held that to be a mere error in law, the court having jurisdiction of the case. In the cases of Lange and Snow there was a denial of a constitutional right."

Our habeas corpus act provides, "It is not permissible to question the correctness of the action of a grand jury in finding a bill of indictment, or a petit jury in the trial of a cause, nor a court or judge when acting in their legitimate province, and in a lawful manner." There are

similar provisions in the legislation of most of the States. It being a common law writ, the right to which is secured to us by our constitution except when in case of rebellion or invasion the public safety may require its suspension, it is not to be supposed that the purpose of the statute was to attempt to detract from its force or curtail its operation, but it is intended as a mere declaration of the common law. It being a constitutional right, the statute would be ineffective except to declare the law, or regulate the method of its enforcement. It was never questioned that the jurisdiction of the committing court over the subject matter and the person of the applicant might be inquired into in this way. But under many of the earlier rulings the power of the court to go beyond this and inquire into the jurisdiction and power of such court to render the particular judgment was denied, when the court was shown to have general jurisdiction of the subject matter and of the person of the petitioner. But the later decisions seem to take a different view. In Church on Habeas Corpus, Sec. 362, it is said: "The decisions of the courts are not uniform or harmonious on this point, but the later decisions of very high authority go to show that jurisdiction of the person and of the subject matter are not alone conclusive; but that the jurisdiction of the court to render the particular judgment in question is a proper subject of inquiry." In Brown on Jurisdiction, before referred to, under the heading, "The three essential elements necessary to render conviction valid," it is said: "These are, that the court must have jurisdiction over the subject matter, the person of the defendant, and authority to render the particular judgment. If either of these elements are lacking, the judgment is fatally defective." Sec. 110. And it is said in People ex rel Tweed v. Liscomb, "If a process good in form issued upon a judgment of a court having jurisdiction, either general or limited, must in all cases be assumed to be valid until the judgment be reversed upon error, the remedy by writ of habeas corpus will be of little value." 60 N. Y., 570,

Many of the earlier decisions have refused to discharge upon habeas corpus under the rule that only questions of jurisdiction could be considered, and that when the committing court had jurisdiction of the subject matter and of the person the judgment was conclusive. Others, while professing to adhere to the same rule, have gone beyond it, and, though the jurisdiction of the committing court over the subject matter and of the person was admitted, have gone into the question of the power of the committing court, under the facts of the case, to render the particular judgment. Thus it is said in a California case: " Of course where a court has jurisdiction of the subject matter and the parties, its judgment is not reversible upon such process. Being conclusive, courts will not go behind it to ascertain whether any errors of law were committed in the proceedings in which it was rendered.'' After stating the principle thus the court, however, immediately proceed to say: "But the judgment is not conclusive upon the authority of the court that rendered it. That, as well as any other matter which would render the proceedings void, is always open to inquiry. It were a legal absurdity to say that a judgment of conviction, valid in form, precluded all inquiry into authority to render it. In Ex parte Kearney, 55 Cal., 212, this court went behind the judgment of the police court of San Francisco, to determine whether the act of which the petitioner in that case was convicted, was a criminal offense known to the law, and having reached the conclusion that it was not, we held the judgment of conviction absolutely void. As was said in that case: " Whenever a court undertakes to imprison for an offense to which no criminality is attached, it acts beyond its jurisdiction. Nearly a hundred years ago, the author of Bacon's abridgment thus expressed the same doctrine: "If the commitment be against law, as being made by one who had no jurisdiction of the case, or for a matter for which by law no man ought to be punished, the courts are to discharge.'' Ex parte Hollis, 59 Cal., 407. And in that case, it being a

commitment for contempt, the court held that the jurisdiction of the court to punish and imprison for such an offense was reviewable by the supreme court on habeas corpus, or on certiorari, and on appeal.

It is aptly said in Ex parte Degener, 17 South Western, 1113 (Texas Appeals), " But jurisdiction is of two kinds, first, the power to hear and determine the particular matter, and to render some judgment thereon; and secondly, the power to render the particular judgment which was rendered. The idea of the early courts seems to have been that jurisdiction of courts consists entirely of the former of these powers." In Neilson, Petitioner, 131 U. S., 184, it is said, " A party is entitled to a habeas corpus not merely where the court is without jurisdiction of the cause, but where it has no constitutional authority or power to condemn the prisoner."

In a Washington case the prisoner was committed for a failure to pay certain costs adjudged against him as the prosecuting witness in a criminal prosecution. The supreme court on original application for habeas corpus decided that the prisoner was detained for a cause not recognized by the law as ground for the judgment of imprisonment, and therefore not within the possible jurisdiction of any court. In a former case they had held that the courts were precluded from inquiring further when it appeared that the petitioner was committed by a court of general jurisdiction in pursuance of its final judgment for a crime triable by such court. Referring to their decision in that case they say: " As applied to that case enough was said; but in this one the qualification that the cause was triable by the court must be extended to cover the condition, that the court's judgment was one which, under the law, it had jurisdiction to render." And they further say that the petitioner was not estopped to maintain the habeas corpus proceeding, by the fact that he might have appealed from the judgment against him. In re Permstick, 3 Wash., 674.

And we think this is the tenor of authority at this time.

The acts constituting the alleged contempt are to be examined to ascertain whether in law they constitute a contempt, for if they do not the court was without jurisdiction to imprison, and the petitioner is entitled to be discharged on habeas corpus.

In Michigan under the constitutional provisons similar to our own there was a statute providing that no court or officer, on the return of any habeas corpus or certiorari, should have power to inquire into the justice or propriety of any commitment for a contempt made by any court or officer according to law and charged in such commitment as therein provided. In a habeas corpus proceeding the supreme court of that State held that they had authority to inquire into the justice or propriety of proceedings in contempt, only so far as to ascertain whether the court or officer had jurisdiction and was proceeding according to law. But they say "the question of jurisdiction necessarily involves an inquiry whether the conduct alleged was in fact a contempt of court and committed under circumstances which authorize the court to proceed to punishment therefor." In re Wood, 82 Mich., 81. In a Texas case where the witness was committed for refusing to answer, it is said: "The legality of the commitment, however, depends upon the power or jurisdiction of the court to ask the question. If the question be 'improper,' if the court interrogate a witness about a matter over which it has no jurisdiction, and about which it has no right to inquire, the refusal of the witness to answer the interrogatory is no contempt of court, and any order or decision which punishes the refusal to answer as a contempt, is void." Holman v. Mayor, 34 Tex., 668.

In ex parte Irvine and Wagoner the petitioners were called as witnesses for the prosecution upon the trial of twelve defendants upon an indictment for a conspiracy to commit an offense against the United States. The petitioners refused to answer certain questions propounded to them on the ground that it might tend to incriminate them. The court decided that the answers to the ques-

tions could not possibly criminate them, and upon their continued refusal committed them to jail for contempt. Writs of habeas corpus were sued out before the Circuit Court of the United States, and in considering the question how far the court might look beyond the commitment and its recitals into the evidence and circumstances upon which the committing court acted, the court say : "The duty of this court to examine into and consider the facts upon which the trial court acted in committing the petitioners can not be doubted.  If the petitioners, in their refusal to answer the questions, were within the protection of the fifth amendment to the Constitution, the power of the court to commit them for their refusal was exceeded, and the invalidity of the commitment may be declared in this collateral inquiry."  Ex parte Irvine, 74 Fed., 954.

In Iowa the petitioner was subpoenaed to come before a justice of the peace to make an affidavit under the provisions of a certain statute.  He refused to appear or testify and was committed by the justice for contempt.  On habeas corpus a majority of the court held that he was properly committed, Justice Beck dissenting.  But upon the proposition under consideration the court seem to have been substantially in harmony.  The majority opinion states it thus:  "We can not in a habeas corpus proceeding review the order of imprisonment for contempt, and reverse, unless the act constituting the alleged contempt was such that we can pronounce as a matter of law that it was not a contempt.  If for instance the justice had no authority to subpoena this plaintiff, and was acting without jurisdiction in doing so, then what he did was done merely as an individual, and whatever contempt there was, if it could be called such, not being for judicial authority, would not be such as the law recognizes and punishes."  In the dissenting opinion it is thus stated:  "Tribunals may decide all questions touching their jurisdiction, but their decisions supporting their jurisdiction are not conclusive, and judgments rendered

without jurisdiction may be assailed either directly or collaterally. The decision of a court that an act is a contempt is a decision as to its jurisdiction and may be questioned in any collateral proceeding. It may, of course, be assailed upon habeas corpus, which is the very proceeding provided by the law whereby the legality of the imprisonment of a citizen may be determined." And the majority of the court in announcing their decision at the close of their opinion fully recognize the principle. They say: "Having reached the conclusion that the justice was not without jurisdiction in issuing the subpœna, and that there was a contempt in fact, we think that this disposes of the case." State ex rel Whitcomb v. Seaton, 61 Iowa, 563.

In a later case under the same statute the petitioners refused to obey a subpœna, or to testify, and were committed for contempt. By a unanimous court it was decided that the evidence sought was not of a character contemplated by the statute, that the justice was without authority to issue the subpœna, that the petitioners were illegally committed, and they were discharged. Dudley v. Mc Cord, 65 Iowa, 671.

The doctrine thus stated, that in commitments for contempt, and in other cases of alleged illegal imprisonment, the court on habeas corpus may inquire into the power of the committing court to make the order, by investigating the question whether the facts constitute a contempt, or in any case whether the facts confer jurisdiction upon the court to make the particular order, and if they do not, to discharge, is, as we believe, sustained by the great mass of the later cases, either in express terms, or tacitly, by acting upon it. We cite a few of the great number bearing upon the question. In re Dill, 32 Kan., 668; People v. Hackley, 24 N. Y., 75; Ingle v. State, 6 Blackf., 574; ex parte Senior, 19 South. (Fla.), 652; ex parte Gould, 35 Pac. (Cal.), 1112; ex parte Rowland, 104 U. S., 604; ex parte Lange, 18 Wall., 163; ex parte Kellogg, 64 Cal., 526; in re Sontag, 64 Cal., 526; Robb

v. Mc Donald, 29 Iowa, 672; ex parte Siebold, 100 U. S., 375; ex parte Mirande, 73 Cal., 371; ex parte Kearney, 55 Cal., 214; ex parte Fisk, 113 U. S., 718; in re Rolfe, 30 Kan., 751; ex parte Parks, 93 U. S., 18; ex parte Virginia, 100 U. S., 339; Cooper v. People, 13 Colo., 353; ex parte Ellis, 37 Tex., Cr. App., 542; ex parte Tinsley, 37 Tex., Cr. App., 527; ex parte Park, 37 Tex., Cr. App., 590; People ex rel Taylor v. Forbes, 143 N. Y., 219; ex parte Webb, 51 Pac., 1027 (Nev.); in re Patzwold (Okla.), 50 Pac., 139; Mallory v. Benjamin, 9 How. Pr., 421; Counselman v. Hitchcock, 142 U. S., 547; ex parte O'Brien, 30 S. W. (Mo.), 159; Dinsmoor v. Bressler, 164 Ill., 223.

When and under what circumstances a witness shall be protected in refusing to answer upon the ground that his answers may tend to criminate him has been very often considered, but is necessarily dependent in a great measure upon the facts of each case. The provision of our constitution is that "no person shall be compelled to testify against himself in any criminal case." Sec. 11, Art. 1. It has been held in some cases that the privilege does not apply except to the defendant in a criminal case; that the term "criminal case" can only mean a prosecution for a criminal offense, and that the prosecution must be against *him*. This view, after a thorough consideration, was rejected in the leading case of Counselman v. Hitchcock, 142 U. S., 547; and we do not understand that it is contended for in this case. "The object was to insure that a person should not be compelled when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime."

Neither is it necessary in order to claim the privilege, that the answer, unconnected with other testimony, should be sufficient to convict him of crime. As said by Chief Justice Marshall in Burr's trial: "This would be rendering the rule almost perfectly worthless. Many links frequently compose that chain of testimony which is necessary

to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible but a probable case, that a witness by disclosing a single fact may complete the testimony against himself; and to every effectual purpose to accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom, he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself, would most obviously be infringed, by compelling a witness to disclose a fact of this description. What testimony may be possessed, or is obtainable, against any individual, the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws.'' It has been held that where a prosecution for the offense is barred by the statute of limitations the privilege does not exist. There are also statutes of the United States and many of the States providing that evidence thus elicited shall not be used against the witness in any prosecution against him, or that he shall not be prosecuted for any matter concerning which he may testify. There is no statute of limitations as to crimes in this State, and we have no statute attempting to confer immunity upon a witness in any case. So that we have only the constitutional provision itself to consider as applied to the facts of the case before us.

It is contended by counsel for respondent, first, that it does not sufficiently appear that an answer to the question would tend to criminate the petitioner; that, quoting from Wharton's Crim. Ev. (ninth ed.) 466 ''there is no answer which a witness could give which might not be-

come part of a supposable concatenation of incidents from which criminality of some kind might not be inferred," that the witness in this case was simply called upon by the questions to state the facts constituting the offense with which the defendant stood charged and for which he had been arrested at the instance of the witness himself; and that the witness can not be permitted to be the exclusive judge whether the answer will criminate him and thus protect a defendant from merited punishment.

It is apparent that these considerations are of the utmost weight as affecting the proper and efficient administration of the criminal law, and it is of primary importance that the rule by which the court is to determine whether the privilege of the witness shall be allowed shall be correctly ascertained. Quoting again from the section of Wharton above referred to: "To protect a witness from answering, it must appear from the nature of the evidence which the witness is called to give that there is reasonable ground to apprehend that should he answer he would be exposed to a criminal prosecution."

In Burr's trial Judge Marshall, in stating the rule, said, "When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be. The court can not participate with him in this judgment, because they can not decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. * * * In such a case, the witness must himself judge what his answer will be; and if he say, on oath, that he can not answer without accusing himself, he can not be compelled to answer." 1 Burr's Trial, 244, 245.

It is urged in this case that the witness had already

made a statement inquired about by the question propounded, and that to rehearse them as formerly stated, which he must do to make a true answer, could not by any possibility incriminate him. But independently of the consideration, to be adverted to more fully hereafter in this opinion, that subsequent acts of the witness, such as compounding the felony, might have intervened changing his attitude in the premises, we think none of the authorities claim any power in the court to determine what the answer shall be. That, from the nature of the case, and of necessity, is in the breast of the witness.

The rule above referred to by which the court must be governed in allowing or denying the privilege is variously stated, but, we think, with substantial harmony. In Richmond v. The State, 2 Iowa, 534, a case relied on by counsel for respondent, the court say: "When it is evident to the mind of the court that the answer can not accuse the witness, the court should require him to respond to the interrogatory. * * * Therefore, we think, the better and safer rule to be that of compelling a witness to answer when it is apparent to the court that such answer would not interfere with his legal privilege." And Judge Marshall, in Burr's trial, supra, summarizes the rule thus: "It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer may disclose a fact which forms a necessary and essential link in the chain of testimony which would be sufficient to convict him of any crime, he is not bound to answer it, so as to furnish matter for that conviction. In such a case, the witness must himself judge what his answer will be, and if he say, on oath, that he can not answer without accusing himself, he can not be compelled to answer."

The rule is more strongly stated by some of the other cases. As, for example, in re Tappan and Douglas, 9 How. Pr., 395, the court say: "The witness alone knows the facts beyond those to be contained in the answer, which may tend to his conviction; the court is not to com-

pel him to tell what those facts are. If, therefore, he says that the answer may tend to convict him, and on that account refuses to answer, and the court can imagine any state of facts under which the answer might lead to such a result, the witness may insist on the protection of the law and refuse to answer."

But we think upon reason and authority the more conservative statement of the rule should be adopted, as in Simmons v. Nolster, 13 Minn., 236: "When it reasonably appears that the answer will have a tendency to expose the witness to a penal liability, or to any kind of punishment, or to a criminal charge, 'the authorities', says Greenleaf, 'are exceedingly clear that the witness is not bound to answer.' 1 Greenleaf Ev., Sec. 451."

We think the opinion of Judge Taft in ex parte Irvine, 74 Fed., 954, 960, states the rule very clearly: "The great weight of authority, as well as a due regard for the right of the community to have the wheels of justice unclogged, as far as may be consistent with the liberty of the individual, leads us to reject the doctrine that a witness may avoid answering any question by the mere statement that the answer would criminate him, however unreasonable such statement may be. The true rule is that it is for the judge before whom the question arises to decide whether an answer to the question put may reasonably have a tendency to criminate the witness, or to furnish proof of a link in the chain of evidence necessary to convict him of a crime. It is impossible to conceive of a question which might not elicit a fact useful as a link in proving some supposable crime against a witness. The mere statement of his name or his place of residence might identify him as a felon, but it is not enough that the answer to the question may furnish evidence out of the witness's mouth of a fact which, upon some imaginary hypothesis, would be the one link wanting in the chain of proof against him of a crime. It must appear to the court, from the character of the question, and the other facts adduced in the case, that there is some tangible and

substantial probability that the answer of the witness may help to convict him of a crime."

Keeping in view this rule and the principle that the court can not compel the witness to disclose what crime the answer would tend to convict him of, as such disclosure would defeat the very object of the constitutional privilege, we proceed to an examination of such facts as appear upon the question. The charge of obtaining the sum of $1,130 from the plaintiff by false pretenses had been preferred against the defendants at plaintiff's instance. They had been returned from Colorado by a requisition obtained upon his affidavit. At the time set for their preliminary examination the plaintiff failed to appear as a witness. It was again set down, and the plaintiff again failed to appear, although he had been duly subpœnaed. Thereupon an information was filed against the plaintiff charging him with compounding the felony of which the defendants were accused, and an attachment issued to bring the plaintiff before the justice as a witness in the preliminary examination of the defendants. The statute prohibiting the compounding of a felony provides that "whoever, having knowledge of the actual commission of a crime of the grade of felony, takes any money or property of another, or any gratuity or reward, or any engagement or promise therefor, upon any agreement or understanding, express or implied, to compound or conceal such crime, or to abstain from any prosecution therefor, or to withhold any evidence thereof, or do any act to encourage or procure the absence of witnesses or other testimony on the examination or trial of such charge, is guilty of a felony and shall be punished," etc., prescribing imprisonment in the penitentiary. (Laws 1890, 142.)

The information filed by the prosecuting attorney charging the petitioner with compounding the felony, first sets out the commission of the felony, as in the original information, and then proceeds to state that the petitioner " then and there having knowledge of the actual commis-

sion of the felony aforesaid by the said Oliver C. Hough,
alias Clifford W. Lang, did then and there feloniously
take and receive from the said Oliver C. Hough, alias
Clifford W. Lang, eleven hundred and thirty dollars
* * * upon the express agreement and understanding
then and there to feloniously compound said felony and
conceal its commission." It therefore appears that when
the witness was called upon to state from his own knowl-
edge the facts constituting the guilt of the defendant
Hough, he was thereby required to testify to the first
and essential fact necessary to his own conviction, viz.:
his "knowledge of the actual commission of the felony
aforesaid;" and at the same time to supply the proof,
and probably the only available proof, of the equally
essential fact in the prosecution of himself, the commis-
sion of the original felony. Adopting then Wharton's
statement of the rule, it appears from the nature of the
evidence which witness was called upon to give that there
was reasonable ground to apprehend that, should he an-
swer, he would be exposed to a criminal prosecution. It
can make no difference that the information against the
petitioner had been dismissed. It was made under oath
by the proper officer, it is not to be presumed that it was
made without some basis of evidence tending to support
it, and the dismissal would in no way interfere with a
future prosecution. It is also urged that evidence thus
extorted could not be subsequently used against the plain-
tiff in any prosecution against him, and that the petitioner
is therefore protected. But the constitutional privilege is
that the evidence shall not be extorted. It is not that
such testimony shall not be used against him, nor that he
shall not be prosecuted for a crime concerning which he
has been required to give testimony tending to incriminate
himself, but that he shall not be compelled to testify. The
principle that evidence obtained by a violation of this priv-
ilege can not be used against him was never intended to
authorize or excuse a violation of such privilege. And,
as before remarked, we have no statute which attempts to

substitute immunity from the consequences of a violation of the privilege, for the privilege itself.

It is insisted that the affidavit made by the plaintiff in the requisition proceedings shows that his refusal to answer and his claim of privilege was not made in good faith. We understand that counsel do not contend that the privilege of the witness was waived by making the statements contained in the affidavit. Indeed, the authorities are clear upon the proposition, that previous-sworn statements in or out of court do not constitute a waiver and do not deprive the witness of his constitutional privilege when he thereafter claims it. In Emery v. State, 78 N. W., 145, the supreme court of Wisconsin said: "The fact that a witness made previous self-incriminating statements in court on some other trial, or out of court, made no difference. The immunity was complete unless waived by the witness with knowledge of his rights. That right exists under our system of constitutional guaranty to the fullest extent, and is to be protected as rigidly and fairly as any other constitutional right, and not to be weakened or impaired by inventing new methods or ways of evading it."

In a Georgia case it was argued that as the witness had voluntarily testified, at a previous trial, as to the very matters concerning which he had at the later trial chosen to remain silent, he had waived his privilege; but the court rejected the proposition, saying, "The fact that Lybrend (the witness) had made the waiver at a former hearing before a different jury, and under circumstances necessarily to a greater or less extent unlike these surrounding the last trial, did not preclude him from exercising his privilege at a later stage of the case. He may, on one occasion, have had reasons for speaking out which were entirely satisfactory to himself; and on the next he may have been influenced to keep silent by other reasons which were, in his opinion, equally cogent. These were matters for himself alone to determine. The privilege is in the highest degree personal, and is a sacred one, which the courts should jeal-

ously guard." Georgia R. R. Co. v. Lybrend, 99 Ga., 421.

In Temple v. Commonwealth, 75 Va., 892, it was held that the fact that the witness testified before the grand jury, and that it was on his testimony that the indictment was found, will not deprive him of his privilege to decline to testify on the trial of the party indicted." See also Cullen v. Com., 24 Grat., 624, to the same effect.

In Illinois the witness who claimed the privilege had instigated the prosecution and had made a sworn statement upon the back of the information to the effect that the allegations thereof were true, yet his conduct was held not to amount to a waiver of his constitutional privilege when called as a witness upon the trial of the accused. In that case the court said: "The privilege which a witness has of refusing to give evidence which will criminate himself, is granted to him upon grounds of public policy, and is one of the safeguards of his personal liberty. It can not be regarded as released or waived by some disclosure which he may have made elsewhere and under other circumstances. If the answer to a question put to him as a witness upon the stand might tend to criminate him, it would not tend any the less to do so because he had elsewhere made a statement having such tendency. The question is not as to what he may have previously said in an affidavit, but the question is whether the disclosure he is asked to make as a witness upon the trial of the case will have a tendency to expose him to criminal charge or penalty," and the court added: "We are of the opinion that his constitutional right in this regard is not abridged or waived by the fact of making the ex parte affidavit indorsed upon the information filed by the prosecuting attorney." Samuel v. People, 164 Ill., 379.

In this case, however, the crime of compounding a felony, if committed by the witness, must have been committed after the affidavit in the requisition proceedings had been made, and the latter, therefore, can hardly throw much light upon the question of his good faith in declining to testify upon the subsequent trial.

There seems, however, to be some misconception regarding the question of good faith. The question is not whether the witness has been in good faith with the prosecution throughout the case. It is rather whether his refusal to testify is really and sincerely dictated by a belief that his answers will tend to criminate him. In the case of ex parte Irvine, supra, Judge Taft lays down the rule upon this branch of the case which seems to us to be the correct one. He says: "We do not understand any of the American authorities to go so far as to hold that where, from the evidence and the nature of the question, the court can definitely determine that the question, if answered in a particular way, will form a link in the chain of evidence to establish the commission of a crime by the witness, the court should inquire into the motive of the witness in pleading his privilege. It is only where the criminating effect of the question is doubtful that the motive of the witness may be considered, for in such a case his bad faith would have a tendency to show that his answer would not subject him to the danger of a criminal prosecution, or help to prove him guilty of a crime."

In the Irvine case it was argued by counsel that the privilege was pleaded merely to shield the defendants on trial. The court, however, held that the witness was entitled to the privilege insisted on. That case makes the proposition entirely clear that when the court can determine from the circumstances and nature of the question that the question is incriminating in character, there is then no question of good or bad faith to be considered.

It is suggested that to permit a witness to refuse to testify under such circumstances would be to place the administration of the criminal law in the hands of witnesses, often influenced by improper motives, thus making convictions difficult and often impossible. It is perhaps sufficient to say that the principle is not a new one. "It is an ancient principle of the law of evidence that a witness shall not be compelled, in any proceeding, to

make disclosures or to give testimony which will tend to criminate him, or subject him to fines, penalties, or forfeitures." Counselman v. Hitchcock, 142 U. S., 547. Citing a number of English cases.

It is said by Starkie to be based upon two grounds, one of policy and one of humanity: "Of policy because it would force a witness under a strong temptation to commit perjury, and of humanity because it would be to extort a confession by duress, every species and description of which the law abhors." Stark. Ev., 40, 41. It long antedates our constitution or the Constitution of the United States. It has been acted upon in the courts of this country and England for a great many years, and no such disastrous consequences in the administration of the criminal law have ensued. In practice it has been found that the privilege is very rarely claimed, and the claim is guarded against abuses as carefully and effectually as the exercise of any other of the unquestioned constitutional rights of the citizen. It must be made under oath and the penalties of perjury attach as in other cases of false testimony if it is not made in good faith; and the witness is not the final judge whether the privilege exists in the particular case, but the decision is to be made by the court. But that it may be abused is not an argument which this court is at liberty to consider, further than to guard against such abuses as far as consistent with the maintenance of the right itself. It is imbedded in the constitution and embodies the wisdom of some centuries of experience upon the subject, and there is no temptation for us to evade or amend it by reason of any considerations of convenience or necessity. The cases of fancied necessity, if there were any relaxation of the principle, would undoubtedly multiply under the pressure of officers and others naturally, and often very properly, eager for convictions, much more rapidly than the cases, where the privilege is claimed, have done, under a full and complete, but just and careful, enforcement of the constitutional right.

We are of the opinion that the imprisonment of the plaintiff is illegal, and that he must be discharged, and it is so ordered.

Potter, C. J., concurs.

Knight, J., dissents.

Potter, Chief Justice (concurring).

I concur in the opinion and conclusions of Mr. Justice Corn.

I regard as entirely immaterial the question whether the order of a district court refusing to discharge a petitioner upon habeas corpus may be brought to this court for review by petition in error or otherwise. Notwithstanding that such an order might be so reviewable, I entertain no doubt whatever of the original jurisdiction of this court in habeas corpus, even in a case where upon the same facts a previous hearing has been had, in the district court, and the petitioner's application denied. That jurisdiction is granted by the constitution in unmistakable language, and the statute does not, in any way, attempt to restrict it, but on the contrary confirms it. Neither in the constitution or statutes is the jurisdiction or its exercise made dependent upon the absence of any other remedy. It seems, therefore, unnecessary to consider or decide whether the order of the district court refusing to discharge the petitioner could be brought here by some appellate proceeding.

Cases may arise where it would not be deemed expedient for this court to exercise its original jurisdiction where, upon the same facts, and in a similar proceeding, a district court or judge shall have previously denied the relief sought. But in a case like the one now before us, where the petitioner is imprisoned in execution of a sentence, and that sentence is alleged to be illegal, and especially where such illegality is alleged to consist in the denial of a constitutional guaranty or immunity, I am

convinced that it is the duty of the court to exercise its jurisdiction in the premises and inquire into the legality of the imprisonment; and if the imprisonment be determined to be illegal, to discharge the petitioner. Otherwise the writ of habeas corpus would be largely deprived of its most beneficent purposes.

Neither do I esteem it material whether the order of the justice committing the petitioner, was or is subject to review on appeal or error by a higher tribunal.

Where habeas corpus is an appropriate remedy, it matters not that a remedy also existed by writ of error, or by some other appellate proceeding. This principle is well established, and I believe that no authority disputes it.

This doctrine is not to be confounded with that other one well understood and thoroughly established that habeas corpus does not take the place of the writ of error, and that in such a proceeding mere errors of law are not reviewable.

To deny our jurisdiction on the ground that the order of the justice is or was appealable, would also deny the jurisdiction of the district court in the habeas corpus proceedings, which were entertained by that court.

I have alluded to the principle that habeas corpus does not usurp the prerogative of a writ of error. The decision of the committing court on questions of law or fact within its jurisdiction is conclusive, and however erroneous the proceedings may be they can not be reviewed collaterally on habeas corpus. It is a fundamental principle that errors and irregularities, not jurisdictional, will not be examined or inquired into on such a writ. But questions affecting the jurisdiction of the court and errors which are jurisdictional may always be examined into on habeas corpus; and this rule is as fundamental as the other.

The inquiry in this case, then, is whether the decision of the magistrate that the petitioner was guilty of a contempt in refusing to answer the questions, amounts, if erroneous, to a mere error of law, or whether a question of jurisdic-

tion is involved in that decision. This matter is fully discussed and the authorities reviewed in Judge Corn's opinion, and all I care to say in respect to it is that upon reason and authority, if the act of the petitioner in refusing to answer the questions was not a contempt in law, the justice was without jurisdiction to commit him. This proposition is sustained by the great weight of authority, and particularly the modern decisions, and in my judgment it rests upon sound reasoning.

If the petitioner is protected by a constitutional privilege as he claims, then he had an absolute right, guaranteed by our constitution, to refuse an answer, and his act in so refusing was not in legal contemplation a contempt. The majority of the court are of the opinion, for the reasons stated by Judge Corn, that he was so protected, and could not lawfully be required to answer the questions. The distinction is clearly laid down in Brown on Jurisdiction, and that author pertinently states, in substance, that if a court attempts to deprive a party of a constitutional guaranty or privilege, its jurisdiction is exceeded. It therefore follows that the magistrate was without jurisdiction to commit petitioner, and the order committing him is void; and where that is the case, under all the authorities, he may be discharged upon habeas corpus.

The contempt charged against the petitioner is not that of disorderly conduct, or disobedience of process, nor in refusing to answer without assigning any reason. He claims that he could not do so without incriminating himself, thereby giving a reason, which, if made in good faith, and under such circumstances as reasonably to disclose that the answers might tend to incriminate him, entitle him to be excused from answering.

There exists but little disagreement among the courts of this country respecting the general principles which must govern this case. Whatever differences there are, grow out of the application of those principles. With most of the decisions cited and quoted from in the dissenting opinion of our brother, Mr. Justice Knight, I

have no fault to find or criticisms to make. They are most of them, at least, in perfect accord with those cited in the majority opinion of the court in this case, and with a very few exceptions do not at all conflict with the views entertained and applied by the court in the case at bar.

Owing to the importance of the questions involved in this hearing, and the fact that they were matters of first impression in this court, I have thought it advisable to thus briefly state the reasons which have led to my conclusions.

KNIGHT, JUSTICE, (dissenting).

I am unable to concur in the opinion and judgment of this court as announced, for reasons, some of which, in view of the learned discussion as submitted, at first glance, may appear of little force.

Admitting all that is claimed for the writ of habeas corpus, its antiquity; that it is in the interest of the oppressed; that it is in many instances beyond legislation, being a part of the constitutional enactments; still I desire, after making such admission, which is in accordance with the views so ably expressed by my associates, to refer to some of the judges and courts that have pointed out the far reaching effects of the abuse or misapplication of this writ, and of its humane intendments, and illustrating the abuses to which it has been subjected.

I am of the opinion that in this case, under the circumstances and upon the showing made, the writ should not have issued that has been made returnable and is being considered here; that while it is true that the constitution gives this court and each of its members original jurisdiction in habeas corpus, there is also abundant authority in our statute that confers upon this court power to review on error proceedings in habeas corpus; and that while the latter authority may not take away the original jurisdiction, still in the interest of a uniform practice it should have such a restraining influence as would make this court

and its members exercise the original jurisdiction with great care and caution, and never when the object of the writ is to review error of inferior courts.

I am of the opinion that to entitle a person called as a witness to the privilege of silence, the court must see from all the circumstances of the case, and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend that the evidence may tend to criminate him if he is compelled to answer, and that a review of a ruling upon this proposition of law should not be by habeas corpus.

I am of the opinion that in the case at bar there was not one fact or circumstance surrounding the case, or brought to the attention of the justice acting as a committing magistrate, that would have excused him for giving to the applicant as a witness the exemption claimed; that if there was cause to excuse the witness from answering, such cause was known only to himself and could not avail him. I claim that a fair and reasonable interpretation of the act of the prosecuting attorney in making the affidavit charging the applicant with having compounded a felony, is that he did it for the reason that he believed the applicant while a witness had agreed not to appear and testify, as he was bound to do, and that when he did appear there was not probable cause to make such a charge, and he withdrew it before a warrant had been served or issued upon the affidavit, and that the one fact that such an affidavit was made is not sufficient to excuse the witness from answering or refusing to give any reason for such refusal, the exemption being for the witness and not for his attorneys to claim. Upon these various propositions of law I offer the following authorities:

The Supreme Court of Washington have this to say of a case in point:

"It appears that a petition had been presented to one of the judges of the superior court of King County, and had been refused, whereupon application has been made to this court. While it is true that the constitution in-

vested the supreme court with original jurisdiction of habeas corpus, it does not follow that it must take original jurisdiction in cases that have been commenced in the superior court, or before a judge thereof. It is true that this is a writ of high personal privilege, and involves personal liberty,— a right which the law most jealously guards; but a citizen's right to liberty is involved in many cases. This question, like all other questions involving his right to liberty, he has a right to have adjudicated by a competent tribunal; and that adjudication, like any other, is presumed to be right until the contrary is made to appear on appeal. It is an adjudication by a competent tribunal, not an adjudication by every competent tribunal, to which the petitioner is entitled. It does not seem to us that it accords with the orderly administration of the law to allow this application to be made to every superior judge and every justice of the supreme court in the State, which would be the practical result, in many instances, of sustaining petitioner's contention. This, we believe, is not the object of the law. The object in giving every judge in the State original jurisdiction, no doubt was to place the remedy within easy reach of the applicant, and to insure him speedy relief when he was entitled to such, and not to give him a multiplicity of trials. It is true that in some of the States the practice is different, but such practice does not commend itself to our judgment, and we can not follow it. When one trial has been accorded the petitioner, he has secured all the rights which the law has guaranteed him. The petition will therefore be denied." In re Graham, 34 Pac., 931.

In Ex parte Kearney, 7 Wheaten, 38, the syllabus is as follows:

"This court has no authority to issue a writ of habeas corpus to bring up the body of a person committed to jail for a contempt by the circuit court of the District of Columbia. Jones moved for a habeas corpus to bring up the body of John T. Kearney, now in jail, in the custody of the mar-

shal, under a commitment of the circuit court of the District of Columbia, for an alleged contempt. The petition stated that on the trial of an indictment in that court, the petitioner was examined as a witness and refused to answer a certain question which was put to him, because he conceived it tended materially to implicate him, and criminate him as a particeps criminis. The objection was overruled by the court, and he having persisted in refusing to answer the question, was committed to jail for the supposed contempt, and for no other cause. Justice Story, of the Supreme Court of the United States, in this case said among other things:

"Upon the argument of this motion, two questions have been made; first, whether this court has authority to issue a habeas corpus where a person is in jail, under the warrant or order of any other court of the United States; secondly, if it have, whether, upon the facts stated, a fit case is made out to justify the exercise of such authority. As to the first question, it is unnecessary to say more than the point has already passed in rem judicatam in this court. In the case of Bollman and Swartwout, 4 C., 75, it was expressly decided upon full argument that this court possessed such an authority, and the question has ever since been considered at rest. The second point is of much more importance. It is to be considered that this court has no appellate jurisdiction confided to it in criminal cases by the laws of the United States. It can not entertain a writ of error to revise the judgment of the circuit court in any case where a party has been convicted of a public offense. And undoubtedly, the denial of this authority proceeded upon great principles of public policy and convenience. If every party had a right to bring before this court every case in which judgment had been passed against him for a crime of misdemeanor or felony, the course of justice might be materially delayed and obstructed, and, in some cases, totally frustrated. If, then, this court can not directly reverse a judgment of the circuit court in a criminal case, what reason is there

to suppose that it was intended to vest it with authority to do it indirectly?"

"It is also to be observed that there is no question here, but that this commitment was made by a court of competent jurisdiction, and in the exercise of an unquestionable authority. The only objection is, not that the court acted beyond its jurisdiction, but that it erred in its judgment of the law applicable to the case. If, then, we are to give any relief in this case, it is by a revision of the opinion of the court, given in the course of a criminal trial, and thus asserting a right to control its proceedings, and take from them the conclusive effect which the law intended to give them. If this were an application for a habeas corpus, after judgment on an indictment for an offense within the jurisdiction of the circuit court, it could hardly be maintained that this court could revise such a judgment, or the proceedings which led to it, or set it aside and discharge the prisoner. There is, in principle, no distinction between that case and the present; for when a court commits a party for contempt, their adjudication is a conviction, and their commitment in consequence is execution; and so the law was settled upon full deliberation in the case of Brass Crosby, Lord Mayor of London, 3 Wilson, 188."

Here follows a discussion of the case referred to, and the justice continues: "So that it is most manifest from the whole reasoning of the court in this case, that a writ of habeas corpus was not deemed a proper remedy where a party was committed for a contempt by a court of competent jurisdiction; and that, if granted, the court could not inquire into the sufficiency of the cause of commitment. If, therefore, we were to grant the writ in this case, it would be by applying it in a manner not justified by principle or usage; and we should be bound to remand the party unless we were prepared to abandon the whole doctrine, so reasonable, just, and convenient, which has hitherto regulated this important subject. We are entirely satisfied to administer the law as we find it, and are all

of opinion that upon the facts of this case, the motion ought to be denied.''·

"The argument of inconvenience has been pressed upon us with great earnestness. But where the law is clear this argument can be of no avail; and it will probably be found that there are also serious inconveniences on the other side. Wherever power is lodged, it may be abused. But this forms no solid objection against its exercise. Confidence must be reposed somewhere; and if there should be abuse, it will be a public grievance for which a remedy may be applied by the Legislature, and is not to be devised by courts of justice. This argument was also used in the case already cited, and the answer of the court to it is so satisfactory that it would be useless to attempt any further refutation. Upon the whole it is the opinion of the court that the motion be overruled. Writ denied.''

Chief Justice Dixon, of the supreme court of Wisconsin, in the case of the petition of Crandall for habeas corpus, says: "It is conceded that for mere error, no matter how flagrant, the remedy is not by a writ of habeas corpus."

Judge Cooley, in his treatise on Constitutional Limitations, 4th ed., page 430, says: "In the great anxiety on the part of our Legislatures to make the most ample provision for speedy relief from unlawful confinement, authority to issue the writ of habeas corpus has been conferred upon inferior judicial officers, who make use of it sometimes as if it were a writ of error, under which they might correct the errors and irregularities of other judges and courts, whatever their relative jurisdiction and dignity. Any such employment of the writ is an abuse. Where a party who is in confinement under judicial process is brought up on habeas corpus, the court or judge before whom he is returned will inquire, first, whether the court or officer issuing the process under which he is detained under jurisdiction of the case and has acted within that jurisdiction in issuing such process.

If so, mere irregularities or errors of judgment in the exercise of that jurisdiction must be disregarded on this writ, and must be corrected either by the court issuing the process or on regular appellate proceedings; second, if the process is not void for want of jurisdiction, the further inquiry will be made whether, by law, the case is bailable, and if so, bail will be taken if the party offers it; otherwise he will be remanded to the proper custody."

A case of interest in this discussion, and one that seems to be persuasive, is that of the People v. Cassels, in the supreme court of New York, 5 Hill, 164. A statement of the facts are in the words following:

"Cassels, the prisoner, was examined on oath (see the United States v. Wyngall, p. 16) and a witness was examined on his behalf. The testimony tended to establish the following facts: In June, 1842, Cassels was arrested and examined before Justice Briggs on a charge of kidnapping and carrying off one Betsey L. Stafford from the County of Chenango to the city of Troy, Rensselaer County. After having been kept under examination about a week, he was discharged by the justice for the want of evidence. He was then summoned to appear before Justice Edwards as a witness on the 11th of July, and was then sworn and examined for the purpose, as was said, of eliciting facts upon which a warrant might be issued against one Sally Grant, of the city of Troy, for her alleged agency in procuring the abortion of Betsey L. Stafford, at the city of Troy, which was followed by the death of said Betsey. When Cassels was sworn, he was not examined touching the supposed guilt of Sally Grant, but was required to state what he knew about the transportation of Betsey L. Stafford from Chenango to Rensselaer County. When asked the question mentioned in the commitment, he declined answering it, on the ground that it might form a link in a chain of evidence tending to criminate himself. Sally Grant was not before the justice, and it was not alleged that she was in the county of Chenango, or that she had ever committed any crime in

that county — the crime imputed to her having been committed in Rensselaer County where she resided.''

''The judge decided that Justice Edwards acted without authority in the proceeding upon which Cassels was sworn as a witness, for the reason that Sally Grant was neither before the justice, nor in the county of Chenango at the time, and that it was not alleged or pretended that she had committed any offense in that county, but only in the county of Rensselaer where she lived: and on that ground an order was made discharging Cassels from imprisonment. The district attorney brought this certiorari to reverse the proceedings before the judge.''

And Justice Bronson upon those facts says: ''If the justice had authority to inquire into the alleged offense of Sally Grant, the commitment of Cassels could not be impeached upon habeas corpus for any supposed error of the justice in requiring the witness to answer an improper question. A contempt was specially and plainly charged in the commitment, and it was the duty of the judge forthwith to remand the prisoner (2 R. S., 567, Sec. 40). The statute expressly forbids an inquiry into the justice or propriety of the commitment in such a case. (Sec. 42.) If there had been no such statute, it is clear upon principle that the judgment or decision of any court, or officer of competent jurisdiction, can not be reviewed on habeas corpus. If there has been error, the remedy is by certiorari or writ of error. When the return states the imprisonment to be by virtue of legal process, the officer may inquire whether in truth there be any process, and whether it appears upon its face to be valid; and he may also inquire whether any cause has arisen since the commitment for putting an end to the imprisonment as a pardon, reversal of the judgment, payment of the fine, and the like. But he can not rejudge the judgment of the committing court or magistrate. (Matter of Clark, 9 Wend., 220; The People v. McLeod, 1 Hill, 404; Sheriff of Middlesex, 11 Ad. & Ellis, 273; 3 Hill, 658, note pl., 30, 31.) The principal, if not the only object of the forty-eighth

section of the habeas corpus act, was to provide for cases where the party is restrained of his liberty without the authority of legal process. In such cases, the return is usually made by a person having an interest in the question, and who has exercised the restraint upon his own responsibility, as the parent, husband, master, or guardian of the person imprisoned; and it is very proper that the facts which they state in the return should be open to investigation. (See 3 Hill, p. 660, note, and the cases there cited). But it is otherwise when the return is made by an officer having legal process. It is evident from the fortieth section of the statute that the Legislature did not intend to provide for a retrial by habeas corpus in such a case. The review is by certiorari, or writ of error. It is quite clear, therefore, that the judge had no authority to inquire into the truth of the fact adjudged by the committing magistrate; to wit, that the prisoner was in contempt for not answering a question put to him when giving his evidence; nor could he inquire whether the question was a proper one, or whether the prisoner was privileged from answering it."

"But the prisoner had an undoubted right to show that the committing magistrate acted without authority; and this is so, notwithstanding the commitment recite the existence of the necessary facts to give jurisdiction. No court or officer can acquire jurisdiction by mere assertion of it, or by falsely alleging the existence of facts on which jurisdiction depends. Now, it turns out, as the judge has found the facts, that this supposed contempt did not happen, as the commitment states, 'on the trial of a cause' before the justice, nor 'upon the examination of one Sally Grant on a criminal complaint.' Sally Grant was never brought before the justice. She was not in the county of Chenango, nor was it pretended that she had ever committed any offense in that county. The crime which they were attempting to fasten upon her was committed in the county of Rensselaer, where she lived. A justice of the peace is for some purposes a town officer,

and for other purposes a county officer. He may issue process for the arrest of offenders where the crime was committed in his county, although the criminal may have escaped in another county. (2 R. S., 706, Secs. 1–5). And possibly he may issue process when the offender is in his county although the crime was committed elsewhere. We are, however, inclined to a different opinion. But it is not now necessary to settle that question. Here, neither the crime nor the offender was in Chenango, and the justice was without the shadow of authority in attempting to inquire into the matter. The whole proceeding was coram non judice. Indeed, it wears the appearance of an attempt to pervert justice, by getting up a sham complaint against Sally Grant for the purpose of compelling Cassels to criminate himself, after a failure to find evidence to sustain the charge which had previously been made against him. But I ought to mention that the justice has not been heard upon this matter; and as there are usually two sides to every case, it is not improbable that the facts may hereafter assume a different appearance."

The supreme court of California in case ex parte McCullough, 35 Cal., 98, say:

"Habeas corpus is undoubtedly the proper remedy for every unlawful imprisonment, both in civil and criminal cases; but an imprisonment is not unlawful in the sense of this rule merely because the process or order under which the party is held has been irregularly issued, or is erroneous. Process which has been irregularly issued may be set aside by the court or officer by whom it was issued, and erroneous judgments or orders may be reversed on appeal or writ of error. The writ of habeas corpus has not been given for the purpose of reviewing judgments or orders made by a court, or judge, or officer acting within their jurisdiction. To put it to such a use would be to convert it into a writ of error, and confer upon every officer who has authority to issue the writ appellate jurisdiction over the orders and judgments of the highest

judicial tribunals in the land.    County judges though occupying an inferior position, and exercising an inferior jurisdiction would be, by such a rule, empowered to review and practically reverse the judgments and orders of the district courts, and of the supreme court itself, and also of the federal courts exercising jurisdiction within the State.    Establish the doctrine that the judgments and orders of courts may be reviewed on habeas corpus, upon the ground of error, and appeals for the correction of errors may be dispensed with in all cases in which the arrest or imprisonment of persons is allowed.    Every criminal action, every civil action in which an arrest is given, and every proceeding for a contempt, could be brought to the supreme court by writs of habeas corpus. Not only that, but as already suggested, inferior tribunals would be called upon to review the judgments of superior tribunals, and tribunals of equal grade to interfere and review each other's proceedings.    Such a rule would render all judicial proceedings amorphous, and lead to the utmost confusion and disorder.    It is well settled that habeas corpus can be put to no such use, and that its functions, where the party who has appealed to its aid is in custody under process, do not extend beyond an inquiry into the jurisdiction of the court by which it was issued, and the validity of the process upon its face.    (People v. Cassels, 5 Hill, 167; People v. Sheriff of New York, 7 Abbott, 96; Ex parte Gibson, 31 Cal., 619.)''

Chief Justice Cole in the case of Mc Caslin v. Smith, 65 Wis., 93, has this to say:

'' But a complaining witness who instigates a criminal prosecution maliciously, and without probable cause, in a sense makes himself party to it.    His position is similar to that of a party who signs as surety an undertaking for the return of property replevied.    Such a surety becomes a quasi party to the suit, and is liable to have judgment entered against him, with his principal, on the failure of the latter to maintain his cause.    Pratt v. Donovan, 10

Wis., 378. We must assume that the defendant in error instituted the criminal prosecution in his own wrong, to harass and oppress an innocent party. There is no hardship in holding that by so doing he submitted himself to the jurisdiction of the examining magistrate."

The supreme court of Massachusetts in the Whitcomb case, 120 Mass., 118, announce the following doctrine:

"Justices of the peace are recognized in the Constitution of the Commonwealth as exercising a part of the judiciary power, and are for some purposes courts of record. Const. Mass., C. 3, Art. 3. Thayer v. Commonwealth, 12 Met., 9. Their authority to punish for contempts, at least so far as is indispensable to the orderly conducting of their business, and especially in the case of the refusal of witnesses, after due summons and payment of their fees, to appear and testify before them, has been generally admitted, and has been regulated by statute from the earliest time of the Commonwealth. St. 1784, C. 28, Sec. 6; Rev. Stats., C. 85, Sec. 33; and Commissioner's note to Sec. 31; Stat. 1838, C. 42; Gen. Sts., C. 120, Sec. 50; C. 131, Secs. 5, 6; Clark's case, 12 Cush., 320; Piper v. Pearson, 2 Gray, 120; State v. Copp, 15 N. H., 212; in re Cooper, 32 Vt., 253."

The supreme court of Pennsylvania, in the case of Passmore Williamson, 26 Pa. Stats, 9, have passed upon several questions here involved. Mr. Justice Black says, at different times, as follows:

"This is an application by Passmore Williamson for a writ of habeas corpus. He complains that he is held in custody under a commitment of the District Court of the United States for a contempt of that court in refusing to obey its process. The process for which he is confined for disobeying was a habeas corpus commanding him to produce the bodies of certain colored persons claimed as slaves under the law of Virginia."

"Is he entitled to the writ he has asked for? In considering what answer we shall give to this question, we are, of course, expected to be influenced, as in other

cases, by the law and the Constitution alone. The gentlemen who appeared as counsel for the petitioner, and who argued the motion in a manner which did them great honor, pressed upon us no considerations, except those which were founded upon their *legal* views of the subject."

"It is argued with much earnestness, and no doubt with perfect sincerity, that we are bound to allow the writ without stopping to consider whether the petitioner has or has not laid before us any probable cause for supposing that he is illegally detained — that every man confined in prison, except for treason or felony, is entitled to it, ex debito justitiæ — and that we can not refuse it without a frightful violation of the petitioner's rights, no matter how plainly it may appear on his own showing that he is held in custody for a just cause. If this be true, the case of ex parte Lawrence (5 Binn., 304) is not law. There the writ was refused, because the applicant had been previously heard before another court. But if every man who applies for a habeas corpus must have it as a matter of right, and without regard to anything but the mere fact that he demands it, then a court or a judge has no more power to refuse a second than a first application.

Is it really true that the special application which must be made for every writ of habeas corpus, and the examination of the commitment which we are bound to make before it can issue, are mere hollow and unsubstantial forms? Can it be possible that the law and the courts are so completely under the control of their natural enemies that every class of offenders against the Union or the State, except traitors and felons, may be brought before us as often as they please, though we know beforehand by their own admissions, that we can not help but remand them immediately? If these questions must be answered in the affirmative, then we are compelled, against our will and contrary to our convictions of duty, to wage a constant warfare against the federal tribunals by firing of writs of habeas corpus upon them all the time. The

punitive justice of the State would suffer still more seriously. The half of the Western Penitentiary would be before us at Philadelphia, and a similar proportion from Cherry Hill and Moyamensing would attend our sittings at Pittsburgh. To remand them would do very little good; for a new set of writs would bring them all back again. A sentence to solitary confinement would be a sentence that the convict should travel for a limited term up and down the State, in company with the officers who might have him in charge. By the same means the inmates of the lunatic asylums might be temporarily enlarged, much to their own detriment; and every soldier or seaman in the service of the country would compel their commanders to bring them before the court six times a week.''

'' But the habeas corpus act has never received such a construction. It is a writ of right, and may not be refused to one who shows a prima facie case entitling him to be discharged or bailed. But he has no right to demand it who admits that he is in legal custody for an offense not bailable; and he does make what is equivalent to such an admission when his own application, and the commitment referred to in it, show that he is lawfully detained. A complaint must be made, and the cause of detainer submitted to a judge, before the writ can go. The very object and purpose of this is to prevent it from being trifled with by those who have manifestly no right to be set at liberty. It is like a writ of error in a criminal case, which the court or judge is bound to allow, if there be reason to suppose that an error has been committed, and equally bound to refuse, if it be clear that the judgment must be affirmed.''

'' We are not aware that any application to this court for a writ of habeas corpus has ever been successful, where the judges, at the time of the allowance, were satisfied that the prisoner must be remanded. The petitioner's counsel say that there is but one reported case in which it was refused, and this fact is given in the argument as

a reason for supposing that in all other cases the writ was issued without examination. But no such inference can fairly be drawn from the scarcity of judicial decisions on a point like this. We do not expect to find in reports so recent as ours those long-established rules of law which the student learns from his elementary books, and which are constantly acted upon without being disputed.''

'' The habeas corpus is a common law writ, and has been used in England from time immemorial just as it is now. The Statute of 31 Car., 2, C. 2, made no alteration in the practice of the courts in granting these writs (3 Barn. & Ald., 420–2; Chitty's Reps., 207). It is merely provided, that the judges in vacation should have the power which the courts had previously exercised in term time (1 Chitty's Gen. Prac., 586), and inflicted penalties on those who should defeat its operation. The common law upon this subject was brought to America by the colonists; and most if not all the States have since enacted laws resembling the English statute of Charles II, in every principal feature. The Constitution of the United States declares that ' the privilege of a writ of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it.' Congress has conferred upon the federal judges, then, power to issue such writs according to the principles and rules regulating it in other courts. Seeing that the same general principles of common law on this subject prevail in England and America, and seeing also the similarity of their statutory regulations in both countries, the decisions of the English judges as well as of the American courts both State and federal, are entitled to our fullest respect as settling and defining our powers and duties.''

'' Blackstone (3 Com., 132) says that the writ of habeas corpus should be allowed only when the court or judge is satisfied that the party hath probable cause to be delivered. He gives cogent reasons why it should not be allowed in any other case, and cites with unqualified approbation the

precedent set by Sir Edward Coke and Chief Justice Vaughan in cases where they had refused it. Chitty lays down the same rule (1 Cr. Law, 101; 1 Gen. Prac., 686–7). It seems to have been acted upon by all the judges. The writ was refused in Rex v. Scheiner (1 Burr., 765), and in the case of The Three Spanish Sailors (2 Black's R., 1324). In Hobhouse's case (3 Barn. & Ald., 420) it was fully settled by a unanimous court as the true construction of the statute, that the writ is never to be allowed, if upon view of the commitment, it be manifest that the prisoner must be remanded. In New York when the statute in force there was precisely like ours (so far, I mean, as this question is concerned), it was decided by the supreme court (5 Johns, 282) that the allowance of the writ was a matter within the discretion of the court, depending on the grounds laid in the application. It was refused in Husted's case (1, 2 Com., 136), and in ex parte Ferguson (9 Johns. R., 139). In addition to this we have the opinion of Chief Justice Marshall in Watkin's case (3 Peters, 202), that the writ ought not to be awarded if the court is satisfied that the prisoner must be remanded. It was accordingly refused by the Supreme Court of the United States in that case, as it had been before in Kearney's case.''

''On the whole, we are thoroughly satisfied that our duty requires us to view and examine the cause of detainer *now*, and to make an end of the business at once, if it appears that we have no power to discharge him on the return of the writ.''

'' The prisoner, as already said, is confined on a sentence of the District Court of the United States, for a contempt. A habeas corpus is not a writ of error. It can not bring a case before us in such a manner that we can exercise any kind of appellate jurisdiction in it. On a habeas corpus, the judgment even of a subordinate State court can not be disregarded, reversed, or set aside, however clearly we may perceive it to be erroneous, and however plain it may be that we ought to reverse it if it were

before us on appeal or writ of error. We can only look at the record to see whether a judgment exists, and have no power to say whether it is right or wrong. It is conclusively presumed to be right until it is regularly brought up for revision. We decided this three years ago at Sunbury, in a case which we all thought one of much hardship. But the rule is so familiar, so universally acknowledged, and so reasonable in itself, that it requires only to be stated. It applies with still greater force, or at least for much stronger reasons, to the decisions of the federal courts. Over them we have no control at all, under any circumstances, or by any process that could be devised. Those tribunals belong to a different judicial system from ours. They administer a different code of laws and are responsible to a different sovereignty. The District Court of the United States is as independent of us as we are of it — as independent as the Supreme Court of the United States is of either. What the law and the Constitution have forbidden us to do directly on writ of error, we, of course, can not do indirectly by habeas corpus.''

''But the petitioner's counsel have put his case on the ground that the whole proceeding against him in the District Court was coram non judice, null and void. It is certainly true that a void judgment may be regarded as no judgment at all; and every judgment is void which clearly appears on its own face to have been pronounced by a court having no jurisdiction or authority in the subject matter. For instance, if a federal court should convict and sentence a citizen for libel; or if a State court, having no jurisdiction except in civil pleas, should try an indictment for a crime and convict the party — in these cases the judgments would be wholly void. If the petitioner can bring himself within this principle, then there is no judgment against him; he is wrongfully imprisoned, and we must order him to be brought out and discharged.''

'' What is he detained for ? The answer is easy and simple. The commitment shows that he was tried, found

guilty, and sentenced for *contempt of court,* and nothing else. He is now confined *in execution of that sentence,* and for no other cause. This was a distinct and substantial offense against the authority and government of the United States. Does anybody doubt the jurisdiction of the District Court to punish contempt? — Certainly not. All courts have this power, and must necessarily have it; otherwise they could not protect themselves from insult or enforce obedience to their process. Without it, they would be utterly powerless. The authority to deal with an offender of this class belongs exclusively to the court in which the offense is committed; and no other court, not even the highest, can interfere with its exercise either by writ of error, mandamus, or habeas corpus. If the power be abused, there is no remedy but impeachment. The law was so held by this court in McLaughlin's case (5 W. & Ser., 276), and by the Supreme Court of the United States in Kearney's case (7 Wheaton, 38). It was solemnly settled, as part of the common law, in Brass Crosbey's case (3 Wilson, 183), by a court in which sat two of the foremost jurists that England ever produced. We have not the smallest doubt that it is the law; and we must administer it as we find it. The only attempt ever made to disregard it was by a New York judge (4 Johns. R., 345), who was not supported by his brethren. This attempt was followed by all the evil and confusion which Blackstone and Kent and Story declared to be the necessary consequences. Whoever will trace the singular controversy to its termination will see that the chancellor and a majority of the Supreme Court, though once outvoted in the Senate, were never answered. The Senate itself yielded to the force of the truths which the Supreme Court had laid down so clearly, and the judgment of the Court of Errors in Yates's case (6 Johns., 503) was overruled by the same court the year afterward, in Yates v. Lansing, 9 Johns. R., 423), which grew out of the very same transaction, and depended on the same principles. Still further reflection at a later period induced the Senate to

join the popular branch of the Legislature in passing a statute which effectually prevents one judge from interfering by a habeas corpus with the judgment of another on a question of contempt.''

'' These principles being settled, it follows irresistibly, that the District Court of the United States had power and jurisdiction to decide what acts constitute a contempt against it; to determine whether the petitioner had been guilty of contempt, and to inflict upon him the punishment which, in its opinion, he ought to suffer. If we fully believed the petitioner to be innocent — if we were sure that the court which convicted him misunderstood the facts, or misapplied the law — still we could not re-examine the evidence, or rejudge the justice of the case, without grossly disregarding what we know to be the law of the land. The judge of the District Court decided the question on his own constitutional responsibility. Even if he could be shown to have acted tyrannically or corruptly, he could be called to answer for it only in the Senate of the United States.''

'' But the counsel of the petitioner go behind the proceedings in which he was convicted, and argue that the sentence for contempt is void, because the court had no jurisdiction of a certain other matter, which it was investigating, or attempting to investigate, when the contempt was committed. We find a judgment against him in one case; and he complains about another, in which there is no judgment. He is suffering for an offense against the United States; and he says he is innocent of any wrong to a particular individual. He is conclusively adjudged guilty of contempt; and he tells us that the court has no jurisdiction to restore Mr. Wheeler's slaves.''

'' It must be remembered that contempt of court is a specific criminal offense. It is punished sometimes by indictment, and sometimes in a summary proceeding, as it was in this case. In either mode of trial, the adjudication against the offender is a conviction, and the commitment in consequence is execution (7 Wheat., 38). This

is well settled, and I believe has never been doubted. Certainly the learned counsel for the petitioner have not denied it. The contempt may be connected with some particular cause, or it may consist in misbehavior which has a tendency to obstruct the administration of justice generally. When it is committed in a pending cause, the proceeding to punish it is a proceeding by itself. It is not entitled in the cause pending, but on the criminal side (Wall., 134). The record of a conviction for contempt is as distinct from the matter under investigation when it was committed, as an indictment for perjury is from the cause in which the false oath was taken. Can a person, convicted of perjury, ask us to deliver him from the penitentiary, on showing that the oath, on which the perjury is assigned, was taken in a cause of which the court had no jurisdiction? Would any judge in the commonwealth listen to such a reason for treating the sentence as void? If, instead of swearing falsely, he refuses to be sworn at all, and he is convicted not of perjury but of contempt, the same rule applies, and with a force precisely equal. If it be really true that no contempt can be committed against a court while it is inquiring into a matter beyond its jurisdiction, and if the fact was so in this case, then the petitioner had a good defense; and he ought to have made it on his trial. To make it after conviction is too late. To make it here is to produce it before the wrong tribunal.''

'' Every judgment must be conclusive until reversed. Such is the character, nature, and essence of all judgments. If it be not conclusive it is not a judgment. A court must either have power to settle a given question finally and forever, so as to preclude any further inquiry upon it, or else it has no power to make any decision at all. To say that a court may determine a matter, and that another court may regard the same matter afterward as open and undetermined, is an absurdity in terms.''

'' It is most especially necessary that convictions for contempt in one court should be final, conclusive, and free

from re-examination by other courts on habeas corpus. If the law were not so, our judicial system would break to pieces in a month. Courts totally unconnected with each other would be coming in constant collision. The inferior courts would revise all the decisions of the judges placed over and above them. A party unwilling to be tried in this court, need only defy our authority, and if we commit him, to take out his habeas corpus before an inferior judge of his own choosing, and if that judge is of opinion that we ought not to try him, there is an end of the case.''

" This doctrine is so plainly against the reason of the thing that it would be wonderful indeed if any authority for it could be found in the books. There is none except the overruled decision of Mr. Justice Spencer of New York, already referred to, and some efforts of the same kind to control the other courts, made by Sir Edward Coke, in the King's Bench, which are now universally admitted to have been illegal, as well as rude and intemperate. On the other hand, we have all the English judges, and all our own, declaring their want of power to interfere with or control one another in this way. I will content myself by simply referring to some of the books in which it is established that the conviction of contempt is a separate proceeding, and is conclusive of every fact which might have been urged on the trial for contempt, and among others want of jurisdiction to try the cause in which the contempt was committed. (4 Johns. R., 325, et. seq.; the opinion of Chief Justice Kent on pages 370–375; 6 Johns., 503; 9 Johns., 423; 1 Hill, 170; 5 Iredell, 199; id., 153; 2 Sandf., 724; 1 Carter, 160; 1 Blackf., 166; 25 Miss., 836; 2 Wheeler's Crim. Cases, p. 1; 14 Ad. & Ellis, 558.) These cases will speak for themselves, but I may remark as to the last one that the very same objection was made there and here. The party was convicted of contempt in not obeying the decree. He claimed his discharge on habeas corpus because the chancellor had no jurisdiction to make the decree, being interested in the cause himself. But the Court

of Queen's Bench held that if that was a defense, it should have been made on the trial for contempt, and the conviction was conclusive. We can not but choose to hold the same rule here. Any other would be a violation of the law which is established and sustained by all authority and all reason.''

'' But certainly the want of jurisdiction alleged in this case would not even have been a defense on the trial. The proposition that a court is powerless to punish for disorderly conduct or disobedience of its process in a case, which it ought ultimately to dismiss for want of jurisdiction, is not only unsupported by judicial authority, but we think it is new even as an argument at the bar. We ourselves have heard many cases through and through before we became convinced that it was our duty to remit the parties to another tribunal. But we never thought that our process could be defied in such cases more than in others.''

'' There are some proceedings in which the want of jurisdiction would be seen at the first blush; but there are others in which the court must inquire into all the facts before it can possibly know whether it has jurisdiction or not. Anyone who obstructs or baffles a judicial investigation for that purpose is unquestionably guilty of a crime for which he may and ought to be tried, convicted, and punished. Suppose a local action to be brought in the wrong county; this is a defense to the action, but a defense which must be made out like any other. While it is pending, neither a party, nor an officer, nor any other person can safely insult the court, or resist its order. The court may not have had power to decide upon the merits of the case; but it has undoubted power to try whether the wrong was done within its jurisdiction or not. Suppose Mr. Williamson to be called before the Circuit Court of the United States as a witness in a trial for murder, alleged to be committed on the high seas. Can he refuse to be sworn, and at his trial for contempt justify himself on the ground that the murder was in fact committed

within the limits of a State, and therefore triable only in a State court? If he can, he can justify perjury for the same reason. But such a defense for either crime has never been heard of since the beginning of the world. Much less can it be shown, after conviction, as a ground for declaring the sentence void.''

Mr. Justice Lowrie in the same case, and in a separate opinion, makes use of the following language:

'' I have not been able to doubt that this court is, in many cases, bound to exercise its judgment, as to the propriety of granting the writ, before allowing it to issue. Notwithstanding the words of the act which imposes a penalty for refusing the writ, we are not forbidden to interpret the law; and the necessity of presenting a petition to the court or to a judge thereof; of stating therein whether the prisoner was detained on criminal or on civil process, or neither; of producing the warrant of committal, or accounting for not doing so; and the fact that traitors and murderers, and fugitives from the justice of other States, are excluded from the benefit of the act; and that the writ was not intended for the relief of convict criminals; Cro. Car., 168; 1 Salk., 348; and was not extended to them by our act; all these matters show plainly enough that the judge or court is not exercising a mere ministerial function in granting the writ. On any other supposition, there is no reason at all for applying to the court, for the prothonotary could grant it as well.''

'' And no one can examine the provisions of Magna Charta; the petition of right, 3 Charles, 1; the statute repealing the Starchamber Court; 16 Ch. 1, C. 10; the habeas corpus act of 31 Ch., 1; and ours of 1785, and the numerous kindred statutes to which that investigation will lead him, without perceiving that a free and open court, and a full and open trial before the superior judges by due course of law, have always been regarded as the best guaranty of the liberty of the citizen. He will see, moreover, very plainly, that the habeas corpus is only a

means by which this end is to be secured, so that no ig-
norance or tyranny of king, or king's counsel, or minister,
or of mere local and inferior courts, dependent on and
governed by local customs, or of justices of the peace,
shall imprison a man without a chance of bail, or a hope
of obtaining a speedy trial by the law of the land. See
7 W. & Ser., 108.''

The above cases can not here be disposed of on the
ground that ''this was not a case where the applicant was
imprisoned, but involved the question of the right to his
freedom, of one held as a slave;'' because the former
(Passmore Williamson case) surely undertakes the discus-
sion of habeas corpus fully and cites with approval the
latter case. (Ex parte Lawrence, 5 Binney, id.)

The case of Ex parte Lawrence, 5 Binn., 304, referred
to in the foregoing opinion of Justice Black, is as follows:

''Phillips, on behalf of Ann Lawrence, petitioned the
court for a habeas corpus under the act of 1785 to one Jo-
seph Vogdes, to bring up the body of Adam Lawrence
then in his custody as a slave, whereas, according to the
suggestion, he was free.''

''It was stated by the counsel that the case had been
already heard upon a habeas corpus by the common pleas
of Philadelphia County, who remanded the prisoner; and
that there was no new evidence to lay before this court.''

''Per Curiam. We do not think that the act of assem-
bly obliges this court to grant a habeas corpus, where the
case has been already heard upon the same evidence by
another court; and we do not think it expedient in this
case, because it has been already heard upon the same evi-
dence, and the party is not without remedy, as he may
resort to a homine replegiando. The court are not, how-
ever, to be understood as saying that they have not au-
thority to issue a habeas corpus in such a case, if they
should think it expedient. Habeas corpus refused.''

An interesting case, and one that directly passes upon
many of the questions here involved, is the recent one,
1895, of Brown v. Walker, 161 U. S., 591; and I quote

from the language of Mr. Justice Brown of the United States Supreme Court in that case:

"This case involves an alleged incompatibility between that clause of the fifth amendment to the constitution which declares that no person 'shall be compelled in any criminal case to be a witness against himself,' and the act of Congress of February 11, 1893, C. 83, 27 Stat., 443, which enacts that 'no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpoena of the commission, * * * on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify, or produce evidence, documentary or otherwise, before said commission, or in obedience to its subpoena, or the subpoena of either of them, or in any such case or proceeding.' The act is supposed to have been passed in view of the opinion of this court in Counselman v. Hitchcock, 142 U. S., 547, to the effect that Section 860, of the Rev. Stats., providing that no evidence given by a witness shall be used against him, his property or estate in any manner, in any court of the United States, in any criminal proceeding, did not afford that complete protection to the witness which the amendment was intended to guarantee." After giving the gist of the Counselman decision and referring to statutes giving immunity from prosecution, the court says: "In the latter case (Queen v. Boyes, 1 B. & S., 311, 321) it was suggested, in answer to the production by the solicitor general of a pardon of the witness under the great seal, that by statute no such pardon under the great seal was pleadable to an impeachment by the commons in parliament; and it was insisted that this was a sufficient reason for holding that the privilege of the witness still existed, upon the ground

that, although protected by the pardon against every other form of prosecution, the witness might possibly be subjected to parliamentary impeachment. It was also contended in that case, as it is in the one under consideration, that a bare possibility of legal peril was sufficient to entitle a witness to protection. Nay, further, that the witness was the sole judge as to whether his evidence would bring him into danger of the law; and that the statement of his belief to that effect if not manifestly made mala fide would be received as conclusive." It was held, however, by Lord Chief Justice Cockburn, that, "to entitle a party called as a witness to the privilege of silence, the court must see, from the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer;" although, "if the fact of the witness being in danger be once made to appear, great latitude should be allowed to him in judging for himself of the effect of any particular question."

"Further than this," said the Chief Justice, "we are of the opinion that the danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things, not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. We think that a merely remote and naked possibility, out of the ordinary course of the law, and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding inter alios, protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice."

"All of the cases above cited proceed upon the idea that the prohibition against his being compelled to testify against himself presupposes a legal detriment to the witness arising from the exposure.   As the object of the first eight amendments to the Constitution was to incorporate into the fundamental law of the land certain principles of natural justice which had become permanently fixed in the jurisprudence of the mother country, the construction given to those principles by the English courts is cogent evidence of what they were designed to secure and of the limitations that should be put upon them.   This is but another application of the familiar rule that when one State adopts the laws of another, it is also presumed to adopt the known and settled construction of those laws by the courts of the State from which they were taken." (Citing authorities.)

"The danger of extending the principle announced in Counselman v. Hitchcock, is that the privilege may be put forward for a sentimental reason, or for purely fanciful protection of the witness against an imaginary danger, and for the real purpose of securing immunity to some third person who is interested in concealing the facts to which he would testify.   Every good citizen is bound to aid in the enforcement of the law, and has no right to permit himself, under the pretext of shielding his own good name, to be made the tool of others who are desirous of seeking shelter behind his privilege."   Then follows in the opinion of the court a discussion of the immunity afforded by the act first described, and this language is used: "It is entirely true that the statute does not purport, nor is it possible for any statute, to shield the witness from the personal disgrace or opprobrium attaching to the exposure of his crime; but, as we have already observed, the authorities are numerous and very nearly uniform to the effect that, if the proposed testimony is material to the issue on trial, the fact that the testimony may tend to degrade the witness in public estimation does not exempt him from the duty of disclosure.   A person who commits

a criminal act is bound to contemplate the consequences of exposure to his good name and reputation, and ought not to call upon the courts to protect that which he has himself esteemed to be of such little value. The safety and welfare of an entire community should not be put into the scale against the reputation of a self-confessed criminal, who ought not, either in justice or in good morals, to refuse to disclose that which may be of great public utility, in order that his neighbors may think well of him. The design of the constitutional privilege is not to aid the witness in vindicating his character, but to protect him against being compelled to furnish evidence to convict him of a criminal charge."

In all fairness it should be conceded that this judgment of the highest court in our land was by a divided court, four of the justices dissenting, and in two separate opinions virtually adhere to the opinion rendered in the Counselman case. Mr. Justice Field, in his separate dissenting opinion concedes all that is necessary for my contention in this case, as I shall show hereafter, by the following language: " It is conceded as an established doctrine, universally assented to, that a witness claiming his constitutional privilege can not be questioned concerning the way in which he fears he may incriminate himself, or, at least, only so far as may be needed to satisfy the court that he is making his claim in good faith, and not as a pretext. Fisher v. Ronalds, 12 C. B., 762; Adams v. Lloyd, 3 H. & N., 351; Regina v. Boyes, 7 Jur. N. S., Part 1, 1158; 22 Am. Law Rev., 21, note, p. 28; 2 Crim. Law Mag., 645, note, 654.

"To establish good faith on the part of the witness in claiming his constitutional privilege of exemption from self-incrimination, where he is examined as a witness in a criminal case, he may be questioned as to his apprehension of criminating himself by his answer, but no further."

A leading case, and one that has come down to us as sound doctrine and runs through a great may if not all

the cases since, where the question involved is, whether it is for the witness or the court to say that the answer to the question propounded might, could, or would incriminate the witness, from the facts made to appear is the case known as the Burr case, where Chief Justice Marshall, after two days' argument upon the one proposition announced his now famous opinion, and while ninety-two years have passed since it was rendered, and this particular question has many times been before different courts, not one, so far as I have found, have denied that it was correct as a whole, but many judges have objected to parts of that opinion being referred to as announcing the doctrine that it supports without question the claim that it is for the witness alone to pass upon the constitutional right of refusing to answer independent of the court, or the circumstances under which the witness is placed at the time. Let us see what Justice Marshall says, among other things, following the statement that has been referred to in the main opinion here, that he is at liberty to refuse to answer if he will say upon his oath that his answer to that question might criminate him comes this language: "When this opinion was first suggested, the court conceived the principle laid down at the bar to be too broad, and therefore required that authorities in support of it might be adduced. Authorities have been adduced, and have been considered. In all of them the court could perceive that an answer to the question propounded might criminate the witness, and he was informed that he was at liberty to refuse an answer. These cases do not appear to the court to support the principle laid down by the counsel for the witness in the full latitude in which they have stated it. There is no distinction which takes from the court the right to consider and decide whether any direct answer to the particular question propounded could be reasonably supposed to affect the witness. There may be questions no direct answer to which could in any degree affect him; and there is no case which goes so far that he is not bound to answer

such questions. The case of Goosely, in this court, is perhaps the strongest that has been adduced. But the general doctrine of the judge in that case must have referred to the circumstances which showed that the answer might criminate him. When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent. The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. They are believed both to be preserved to a reasonable extent, and according to the true intention of the rule and of the exception to the rule, by observing that course which it is conceived courts have generally observed." 25 Fed. Case, page 39.

In the case of Kirschner v. The State, 9 Wis., 136, we find the following language: "Although the witness is the judge of the effect of his answer, and is not bound to disclose any facts or circumstances to show how the answer would affect him, as that would defeat the rule and destroy the protection afforded by the law, yet the court is to determine under all the circumstances of the case whether such is the tendency of the question put to him, and whether he shall be required to answer; as otherwise it would be in the power of every witness to deprive parties of the benefit of his testimony by merely colorable pretense that his answer to questions would have a tendency to implicate him in some crime or misdemeanor, or would expose him to a penalty of forfeiture, when it is clear, as we think it was in this case, that the questions have no such tendency."

In Calhoun v. Thompson, 56 Ala., 166, the court says: "In the first instance, it is the province of the court to determine whether any direct answer to the question proposed will furnish criminating evidence against the witness. If it is not apparent such would be the tendency of the answer, the witness is not privileged from testify-

ing.  While it is of the highest importance to protect the witness from self-incrimination, it is also of importance that the privilege the law extends to him should not be perverted to the suppression of evidence which can be safely given.''

In the case of Richman v. The State, 2 Iowa, 532, the court says: '' When it is evident to the mind of the court that the answer can not accuse the witness, the court should require him to respond to the interrogatory.  If this were not the case, it would be in the power of the witness, when called upon to give testimony in a criminal case, to refuse to do so.  If he is to be the sole judge whether the answer would implicate him by thus answering, it would be impossible to elicit any testimony.  Perjury could not only be committed with impunity by stating that the answer would criminate him, but the guilty would be screened from merited punishment.  We can not sanction a rule fraught with such dangerous consequences.  The direct tendency of such a rule would be to suppress the truth and prevent the administration of justice.  Therefore, we think the better and safer rule to be that of compelling the witness to answer, when it is apparent to the court that such answer would not interfere with his legal privilege.''

The Circuit Court, S. D., New York, in the case of the United States v. Mc Carthy, announce the rule to be as follows: '' It is not sufficient to excuse the witness from answering that he may in his own mind think his answer to the question might by possibility lead to some criminal charge against him, or tend to convict him of it if made, the court must be able to perceive that there is a reasonable ground to apprehend danger to the witness from his being compelled to answer.  Regina v. Boyes, 1 Best & S., 311; Whart. Ev., Sec. 538.''

The supreme court of Iowa upon this subject in the case of the State v. Duffy have this to say: '' The true rule upon this subject will be found discussed by Chief Justice Marshall (1 Burr's Trial, 244) and in The People

v. Mather, 4 Wend., 230; Bellinger v. The People, 8 id., 595, and the cases there cited. * * * It is not left alone for the witness to determine whether the answer would tend to criminate him. He is not required to explain how he would be criminated, for this would or might annihilate the protection secured by this rule. But it is for the court to determine ' whether the answer can criminate him directly or indirectly, by furnishing direct evidence of his guilt, or by establishing one of the many facts, which together may constitute a chain of testimony sufficient to warrant his conviction, but one of which itself could not produce such result.' ''

During the discussion of the case of Regina v. Boyes, a case that has been referred to so many times, Justice Blackburn said: '' Taylor refers to an American case, The People v. Mather, 4 Wend., 229, where Marcy, J., delivered the judgment of the court, and after a learned and elaborate argument, decided that the witness there was not obliged to answer. His conclusion is, p. 257, ' I think that the judge could not safely say that the privilege was claimed by the witness in this case as a mere subterfuge to suppress the truth, and thereby aid the escape of the guilty.' That is the reason of the decision, and it is a very sensible rule to go by.''

In the case of State v. Pancoast, 5 N. D., 514, the court makes use of the following language: '' We must not be understood to mean that, in every case where a witness under oath claims his privilege on the ground that his answer will tend to criminate him, the privilege will be granted. Ordinarily it will, and the witness can not be required to specify in what manner his answer may be incriminating. This would be to destroy the privilege. But when a court can discover no reasonable theory upon which the answer could be incriminating, further investigation may be made or the privilege denied. A witness will not be permitted to make any fraudulent use of his privilege.''

In the case of State v. Thaden, 43 Minn., 253, Justice Mitchell makes use of the following language: '' The first

error assigned is the ruling of the trial court in compelling this witness to answer certain questions, he having previously declined to do so, claiming that the same might tend to criminate himself. While no principle of the common law is more firmly established than that which affords a witness the privilege of refusing to answer any question which will criminate himself, yet its application is attended with practical difficulties. To hold that a witness himself is the sole and absolute judge whether the answer will criminate him would be to place it in his power to withhold evidence whenever he saw fit. Such a rule could not be tolerated for a moment. On the other hand, to require him to state what answer he would have to give, or to explain fully how his answer would tend to criminate, would deprive him of the very protection which the law designs to afford. Moreover, the reason of the rule forbids that it should be limited to confessions of guilt, or statements which may be proven in subsequent prosecutions as admissions of facts sought to be established therein; but it should be extended to the disclosure of any fact which might constitute an essential link in a chain of evidence by which guilt might be established, although the fact alone would not indicate any crime. Hence, the problem is how to administer the rule so as to afford full protection to the witness, and at the same time prevent simulated excuses. All the authorities agree to the general proposition that the statement of the witness that the answer will tend to criminate himself is not necessarily conclusive, but that this is a question which the court will determine from all the circumstances of the particular case, and the nature of the evidence which the witness is called upon to give. But the question upon which the cases seem to differ is as to what we may call the burden of proof, some holding that the statement of the witness must be accepted as true, unless it affirmatively appears from the circumstances of the particular case that he is mistaken, or acts in bad faith; while other cases hold that to entitle a witness to the privilege of silence, the court

must be able to see from the circumstances of the case and the nature of the evidence called for that there is reasonable ground to apprehend danger to the witness, if he is compelled to answer. The following are a few of the leading cases treating on this subject: 1 Burr's Trial, 255; Reg. v. Boyes, 1 Best & S., 311, and several others. The difference is theoretical rather than practical; for it would be difficult to conceive of an instance where the circumstances of the case and the nature of the evidence called for would be entirely neutral in their probative force upon the question whether or not there was reasonable ground to apprehend that the answer might tend to criminate the witness. After consideration of the question and an examination of the authorities, our conclusion is that the best practical rule is that laid down in some of the English cases, and adopted and followed by Chief Justice Cockburn, in Reg. v. Boyes, supra: "That to entitle a party called as a witness to the privilege of silence, the court must see from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer." To this we would add that when such reasonable apprehension of danger appears, then, inasmuch as the witness alone knows the nature of the answer he would give, he alone must decide whether it would criminate him. This, we think, is substantially what Chief Justice Marshall meant by his statement of the rule in the Burr trial. As was said in Reg. v. Boyes, supra, the danger to be apprehended must be real and appreciable with reference to the ordinary operations of law, in the ordinary course of things; not a danger of an imaginary or unsubstantial character, having reference to some extraordinary and possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. A merely remote and naked possibility, out of the ordinary course of the law, and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice."

"To entitle a person called as a witness to the privilege of silence, the court must see from all the circumstances in the case, and the nature of the evidence which the witness is called on to give, that there is reasonable ground to apprehend that the evidence may tend to criminate him if he is compelled to answer. The danger to be apprehended must be real and appreciable with reference to the ordinary operation of law, in the ordinary course of things, and not imaginary and unsubstantial, or a mere remote and naked possibility."

The above is found in the syllabus of a case in 43 Minn., 253. The case is all in point, but particularly the statement that in claiming exemption the witness did not claim that an answer would criminate, but that it might criminate. The same distinction is here.

Chief Justice Brickell, in case found in 56 Ala., 169, says: "The humane maxim of the law is, that no one is bound to accuse himself. A witness, though a party to a suit, can not be compelled to answer any question, the answering of which may expose or tend to expose him to a criminal charge, or to any kind of punishment. 2 Phill. Ev., 929; 1 Green. Ev., Sec. 451. In the first instance it is the province of the court to determine whether any direct answer to the question proposed will furnish criminating evidence against the witness. If it is not apparent such would be the tendency of the answer, the witness is not privileged from testifying. While it is of the highest importance to protect the witness from self-crimination, it is also of importance that the privileges that the law extends to him should not be perverted to the suppression of evidence that can be safely given. 2 Phill. Ev., 933. We can not discover that the evidence sought to be elicited could have the least tendency to criminate the witness. The argument of counsel assumes that in this proceeding by writ of habeas corpus, we can inquire into and correct nearly all errors which may have been committed by the district court in the control of the case originally. This has been so often denied by this court and the proposition

is so clear that in a writ of habeas corpus nothing can be inquired into but the jurisdiction of the court, that it is unnecessary to pursue the entire line of argument by counsel for appellant. Cuddy, Petitioner, 131 U. S., 280. Above found in 134 U. S., 148.

Book 32, Lawyer's Rep., Ann., p. 135, contains a case that is interesting, and discusses the Counselman case that has been referred to many times, reported in 142 U. S., 547, and several other cases. After referring to the language of Chief Justice Marshall in the Burr case, this decision says: "The authorities agree that the right of privilege against compelling disclosure of incriminating evidence is personal to the witness, he alone being entitled to invoke its protection, and that it may be waived by him. Whether the court or the witness has the right to determine the question of privilege, or to what extent the claim of privilege is left to the determination of the witness, has not been so uniformly stated in the decisions. It has never been recognized that he alone has the right in all cases to decide whether his answer will tend to criminate him. Such a rule would be mischievous and enable unscrupulous witnesses to defeat the ends of justice in many cases. And this opinion goes on and learnedly points out distinctions that can be drawn from opinions that seem to decide otherwise."

The Georgia case referred to in the opinion of this court in this case was a civil action for personal injuries against a railway company, and part of the syllabus of the case is as follows: "A party, though introduced as a witness in his own behalf, may, upon cross-examination as to matters not voluntarily testified about on his direct examination, decline to give testimony which would tend to criminate him, or to bring infamy, disgrace, or public contempt upon himself or his family, notwithstanding the fact that at a previous trial of the case he had waived his privilege of remaining silent as to these matters. A waiver of this kind is not binding upon a witness at a trial subsequent to that at which the waiver was made."

And in the opinion of the court, says, "Ordinarily, the accused in a criminal case has no right to testify at all, and generally, if not universally, statutes conferring that privilege expressly, or in effect, annex as a condition that he must submit to the fullest cross-examination. He pays this price for the benefit of swearing for himself. We have in Georgia no statute allowing the accused in a criminal case to be sworn as a witness, and our statute allowing parties in a civil case to testify in their own behalf contains no condition in any manner abridging their rights or privileges as witnesses arising under our constitution, or the above cited sections of the code. * * * The second trial is a de novo investigation before another jury, whose duty it is to consider the case in the light only of the evidence adduced at that hearing."

The case of Temple v. Commonwealth, 75 Va., 892, referred to, was a case where the witness thought he was under arrest, and was taken before the grand jury and gave evidence, was committed to jail for want of a bond to appear as a witness, and while in jail was advised of his constitutional right. The court makes the ruling referred to entirely consistent, and the following is some of the language used: "In the case before us it appears that the plaintiff in error, while held in jail as a witness, consulted with counsel, who advised him that he would criminate himself if he testified in the case against Berry and gave the same testimony which he had given before the grand jury. The court might well have inquired into the fact whether he had actually received such advice of counsel, or if it believed that such was disreputable, and that the advice was given simply to protect the offender, or to shield a contumacious or bribed witness — all these matters might have been properly inquired into by the court." And Justice Staples, in his separate opinion concurring, says: "No suggestion is made here that the witness was contumacious, or that his answer would not tend to criminate him."

In the case of Samuel v. The People, 164 Ill., 379,

30

where it is held that a witness does not lose his constitutional right by reason of the fact that he has made affidavit on the information to the truth of the statements therein contained, the court proceeds to show that such affidavit was not a necessary part of the procedure, and after referring to the Virginia case last above cited with approval, says: "In what is here said we merely hold that, if the witness was entitled to claim his privilege in this case, he did not waive his right to claim such privilege by reason of having made the affidavit upon the information."

As to the applicant's right of appeal I submit the following: Section 3126 of the Revised Statutes of Wyoming is as follows: "An order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment, and an order affecting a substantial right, made in a special proceeding, or upon a summary application in an action, after judgment, is a final order which may be vacated, modified, or reversed, as provided in this chapter. (S. L. 1886, Ch. 60, Sec. 778, R. S. O., Sec. 6707.)"

And Section 3128 is as follows: "A judgment rendered or final order made by the district court, may be reversed, vacated, or modified by the supreme court, for errors appearing on the record. (S. L. 1886, Ch. 60, Sec. 780, R. S. O., 6709.)"

If a construction of these sections by the supreme court of Ohio was had prior to their adoption, such construction become a part of the law of Wyoming as all will admit, and a decision of a supreme court upon a statute identical with ours is to say the least persuasive.

In the case of ex parte James Collier on habeas corpus 6 O. S., 56 (1867), the court makes use of the following language:

"This proceeding is brought here by the marshal, on certiorari. It is supposed that he relied, in the adoption of this form, on Section 10 of the amendatory act securing the benefit of the writ of habeas corpus, passed Feb-

ruary 8, 1847 (Swan's Stat., 454), which provides: 'That the proceedings on any writ of habeas corpus shall be recorded by the clerks, and may be reviewed on writs of error and certiorarim as in other cases *now* provided by law.' "

" At the time of this enactment, writs of error and of certiorari were, by law, the remedies in use for reviewing and correcting proceedings at law, in civil or criminal cases; but Section 530 of the code, which took effect July 1, 1853, declares that writs of error and certiorari, to reverse, vacate, or modify judgments or orders in civil cases, are abolished; and the petition in error is, by Section 515 of the code, substituted in their place."

" We regard this in the nature of a civil proceeding. But if it be in the nature of a criminal proceeding against a prisoner charged with crime, it is subject to the fatal objection that no such remedy can be maintained in favor of the prosecution against the defendant.   The right to prosecute a writ of error or certiorari against one who is indicted and tried for a crime or offense, is not given to the state, nor to those who prosecute offenders under its laws."

" Section 604 of the code enacts, 'That until the Legislature shall otherwise provide, this code shall not affect *proceedings* on habeas corpus,' etc.   It may be claimed that this clause, by its peculiar phraseology, saves the habeas corpus act, and all of the remedies given by it, from the operations of the code.   The word 'proceedings' includes, we think, nothing more than the doings of the judge who allows the writ, and is limited to the hearing before him.   The filing of a petition in error is a proceeding before another tribunal.   It is new in its character, and affects a review of the decision of the judge, without forming any part of the case before him."

" The allowance of the writ; the bringing forward of the petitioner before the judge; the inquiry into the cause of his caption and detention; the introduction of evidence, and the liberation, or other disposal of the relator are all

to be governed by the act relating thereto; and, as to other questions, to be determined by some other tribunal though arising out of the case made on the writ, the code prescribes the form by which they are to be governed."

"We adopt this construction, the more willingly, as it secures uniformity of practice in cases of error in civil proceedings, which seems to be a prominent object of the code (see Section 605); and, if carried out, will be found useful to the profession. The writ is dismissed for want of jurisdiction."

If it be urged that Section 3128, id., does not apply because reference is made to the district court only, an inspection of the case of King v. King, 38 Ohio State, 370 (1882), will disclose a construction of that section which makes it applicable to proceedings before a judge at chambers. In that case the court says: " A judge of the court of common pleas is ex officio a judge of the district court, and as such is empowered to grant temporary alimony pending an appeal with respect to permanent alimony. 72 Ohio L., 145, Sec. 9; 75 Ohio L., 749, Sec. 13; Rev. Stats., Sec. 5701. The order thus made in such special proceeding (75 Ohio L., 726; 2 Rev. Stats., 1361), is in its nature final, and may be reviewed on error. 75 Ohio L., 804, Sec. 1; Rev. Stats., Sec. 6707; O'Donnell v. O'Donnell, 1 Disney, 299; Brigel v. Starbuck; 34 Ohio St., 280; Carpenter v. Canal Co., 35 Ohio St., 307, 315; Foss v. Foss, 100 Ill., 576; 2 Bishop's M. & D., Sec. 406. While the better practice is for the judge making such order to sign it, this is not essential to its validity, where, as here, it was entered on the journal by direction of the judge as required by statute (Rev. Stats., Secs. 4963, 5331; Osburn v. The State, 7 Ohio, pt. 1, p. 212); and the provisions as to signing the journal which the former practice act contained (Sheehan v. Davis, 17 Ohio St., 571), was not carried into the code."

In line with the foregoing is the decision of this court in Smith Drug Co. v. Casper Drug Co., 5 Wyo., 510,

by the use of the following language: "An objection is made that no proceedings in error could have been instituted in the case, as the order discharging the attachment was not a final order and is not appealable under our code. Under code provisions similar to ours, the courts of last resort in other States have held that the order dissolving or sustaining an attachment is a final order affecting the substantial rights of the parties, and may be reviewed without bringing up the whole case after final judgment, and this is undoubtedly the correct rule, even though there is no direct statutory provision in our code authorizing an appeal in such cases, except as to final orders generally. Watson v. Sullivan, 5 O. S., 42; Harrison v. King, 9 id., 388; Adams Co. Bank v. Morgan, 26 Neb., 148."

The fact that this court in this proceeding can not review the decision of Judge Scott of the District Court in the proceeding before him on habeas corpus can not be denied and is not claimed. I feel warranted in view of the importance of this case, to refer to some of the authorities on that subject briefly. The supreme court of Nevada, in case ex parte Winston, say: "A habeas corpus is not a writ of error; it can not be used to authorize appellate jurisdiction. On a habeas corpus the judgment of an inferior court can not be disregarded. We can look at the record to see whether a judgment exists, and have no power to say whether it is right or wrong. It is conclusively presumed to be right until reversed; and when the imprisonment is under process, valid on its face, it will be deemed prima facie legal, and if the petitioner fails to show a want of jurisdiction in the magistrate or court whence it emanated, his body must be remanded to custody." (Citing several authorities.)

In case ex parte Shaw, 7 O. St., 81, we find the following: "Questions of doubtful jurisdiction are frequently involved in a record which are proper subjects of consideration upon a writ of error, and which should not, therefore, be entertained or decided upon habeas corpus. * * * It is said to be the practice in some parts of this State to

use the writ of habeas corpus as a short and summary mode of reviewing, as upon a writ of error, and annulling the sentences of courts. If this be so, it is an abuse of the writ of habeas corpus which can not be too soon corrected."

I can see no force in the argument that a law shall be considered of less effect by reason of the arrangement of the statute, whether it be in the code of civil procedure or included in the provisions as to habeas corpus, it is the law just the same. The fact that probate judges were given jurisdiction in habeas corpus and mandamus, only shows that an unconstitutional attempt was made to confer upon citizens of the Territory certain judicial powers that were being exercised by those in whose selection they had no voice or vote.

While it was admitted in the argument of this case that the proceedings had before Justice Scott of the district court on habeas corpus were only made a part of the petition for the reason that the law required it to be done where a second application is made; and it was conceded that those proceedings could not be reviewed here on this proceeding, still we find all through the hearing and in the final judgment, reference to what was done by, or in the proceeding, before Justice Scott; as, for instance, the question of good faith was not referred to in the justice's court. The affidavit made by Miskimmins to obtain a requisition first came into the case during the proceedings before Justice Scott; and, as it is referred to in the opinion of the court at considerable length, I desire to set it out in full, calling attention to the fact that it was made in the presence of the justice of the peace, who also knew all the circumstances of the making of the affidavit by the prosecuting attorney, and of his virtually having withdrawn the same, and who upon the examination before him as committing magistrate, when the applicant refused to make answer to the questions (which are set out in the opinion of the court, and it would be well to read) refused to allow the claimed privilege of applicant because there

was nothing in the questions, nor in the case or its surroundings; nor did the witness make it appear in any way that the answer to the questions as propounded would in the remotest possibility tend to criminate him; and if he committed error in this finding and judgment, it can not, as I claim, be reviewed on habeas corpus. Here is the affidavit:

The State of Wyoming ⎱ ss.
County of Laramie.   ⎰

#### AFFIDAVIT.

John Miskimmins, of the County of Laramie, in the State of Wyoming, being first duly sworn according to law, upon his oath says as follows: that he is the principal and complaining witness against Clifford W. Lang and James Raff, who have fled from the justice of the State; that the application for a requisition is made in good faith, for the sole purpose of punishing the accused, and that he does not desire or expect to use the prosecution for the purpose of collecting a debt, or for any private purpose, and that he will not directly or indirectly use the same for any of said purposes.

Affiant further says, that on or about the 11th day of July, A. D. 1899, at the County of Laramie, in the State of Wyoming, James Raff represented to John Miskimmins, this affiant, that he, James Raff, was worth the sum of fifteen thousand ($15,000) dollars, which amount he desired to invest in cattle, that he had come out here to Wyoming for that purpose; that thereupon Clifford W. Lang represented to John Miskimmins, this affiant, that he, the said Clifford W. Lang, was the owner of sixty head of cattle, that said cattle were ranging on the ranch of Bert Wilkins, in Converse County, Wyoming; and that he, the said Clifford W. Lang, desired to dispose of the same, that James Raff would purchase the said bunch of cattle, if the said bunch of cattle was larger in point of

numbers, that the said James Raff said to this affiant, that Clifford W. Lang was the owner of a small bunch of cattle, that he also held an interest in the Woolstein Liquor Company, and that he was very foolish for selling his cattle, that the cattle were worth more money than Lang asked for them.

Affiant further says that Clifford W. Lang represented to this affiant, that he, the said Clifford W. Lang, was desirous of getting out of the cattle business, and proposed to sell to John Miskimmins, this affiant, the whole bunch of cattle for the sum of nineteen dollars and fifty cents ($19.50) per head.

That this affiant, believing the said Clifford W. Lang to be the owner of said cattle, purchased the cattle from the said Clifford W. Lang, that he paid therefor the sum of eleven hundred and thirty dollars ($1,130.00), by a sight draft on the Flato Commission Company of South Omaha, Neb., payable to the order of C. W. Lang.

Affiant further says that thereupon the said Clifford W. Lang cashed the said draft at the First National Bank of Cheyenne, that thereupon he said to this affiant that he would take the next train for Salt Lake City, but was found by this affiant on the outgoing train bound for the city of Denver, that on this affiant meeting the said Clifford W. Lang on the said Denver train, he, the said Clifford W. Lang, frankly admitted to this affiant that the cattle deal had been a bogus one, but that he, the said Clifford W. Lang, had turned $1,130.00 over to his confederate, the said James Raff, who had gone on ahead and was awaiting him at Evans, Colo., and if he, this affiant, would accompany him to Evans, Colo., the $1,130.00 would be returned to this affiant.

Affiant further says that thereupon he accompanied the said Clifford W. Lang to Evans, Colo., and that upon their arrival at Evans, Colo., they proceeded to a room over a saloon of one O'Grady, where he was confronted by James Raff, Clifford W. Lang, and Elmer Luther, that when this affiant demanded restitution of the $1,130.00,

the said Clifford W. Lang drew from a valise a revolver, with which he threatened to kill this affiant, using these words, "You son of a bitch, this is a game, and you got the worst of it. I sold you no cattle, and if you do not go back to Cheyenne, and keep your mouth shut, I will blow your light out."

Affiant further says that Elmer Luther, on the 12th day of July, at the county of Weld, in the State of Colorado, shook his fist in this affiant's face, and said as follows: "You come down here to skin us, God damn you, but you got the worst of it; I have got the money, you better go back to Cheyenne, and keep your damned mouth shut, or some of us will get you."

Affiant further says that the said Clifford W. Lang and the said James Raff have fled from the justice of this State, and are now in the State of Colorado, that they are now detained in the Weld County jail, at Greeley, at the instance of this affiant, that the aforesaid fugitives were in the State of Wyoming, on the 11th day of July, A. D. 1899, at the time of the commission of this felony.

And further affiant sayeth not.

JOHN MISKIMMINS.

Sworn and subscribed before me this 14th day of July, A. D. 1899.

JOHN A. MARTIN,
Justice of the Peace.

{ SEAL }

Counsel by an ingenious appeal to the humanitarian application of habeas corpus, have partially hidden the possible effect of a decision for which they contend and have secured. I desire to call attention to some of the statements in the able opinion just rendered: "It is urged in this case that the witness had already made a statement inquired about by the question propounded, and that to rehearse them as formerly stated, which he must do to make a true answer, could not by any possibility incrimi-

nate him.   But independently of the considerations to be adverted to more fully hereafter in this opinion, that subsequent acts of the witness, such as compounding the felony, might have intervened, changing his attitude in the premises.''   Page 16 of the opinion of this court.   And again, on page 21, the following language: '' In this case, however, the crime of compounding a felony, if committed by the witness, must have been committed after the affidavit in the requisition proceedings had been made; and the latter, therefore, can hardly throw much light upon the question of his good faith in declining to testify upon the subsequent trial.''   Applying this law, which, as I claim, becomes such here and now for the first time, to the facts in the case, most of them as shown by the opinion of this court, a witness may instigate and institute a criminal prosecution.   Afterward (the parties complained of being outside the jurisdiction of the court and in another State) he may, for the purpose of securing a requisition, make an affidavit, setting forth such facts as show that an infamous crime has been committed, and that he was the victim of that crime, and showing that without his evidence there could not possibly be a case presented.   Upon such a showing the chief executive of the State must issue a requisition, and does.   The parties complained of are apprehended and presented for a preliminary examination before a court of competent jurisdiction.   The witness originally complaining being the petitioner here, failing to appear, although duly subpœnaed, is charged by the prosecuting officer on affidavit with compounding a felony. The opinion here says of the affidavit: '' It was made under oath by the proper officer.   It is not to be presumed that it was made without some basis of evidence tending to support it.''   Afterward the witness appearing without having been arrested upon any warrant issued by reason of the making of said affidavit, and there being then no evidence remaining after he had appeared that he had even attempted to compound a felony, the proceeding, so far as it had gone, was withdrawn and annulled.   The

witness can then be sworn and take the stand and refuse to answer questions based upon statements to instigate the procedure and sworn to for the purpose of apprehending the defendants then and there on examination, because and for the reason that by answering such questions so propounded he might incriminate himself, of what, he does not say, and never has said. His counsel first said perjury, because the prosecuting attorney announced in the justice court that if the witness did not answer in a certain way he would proceed against him for perjury; but that reason seems to have been abandoned. And now it is said that after he was subpœnaed as a witness in the case he had caused to be instituted he may have compounded a felony. He has never said so, and as is correctly stated, was not bound to say so, nor that he had committed perjury. The justice who was holding the examination, and who, it appears, was familiar with all the facts, could not see any possible danger to the witness by answering the questions, and ordered him to do so; and upon his refusal committed him for contempt, and a judge of the district court reviewing the action of the magistrate on habeas corpus, and after listening to all the evidence that was introduced before the magistrate, and more, could not find from all or any of the circumstances of the case any ground for claiming the privilege and ordered the witness to answer, and upon his refusing so to do remanded him to the custody of the sheriff, stating at the same time that he did not believe that the claim was made by the witness in good faith, and that the judgment of the court that had jurisdiction of the case should not be disturbed. And I am of the same opinion, and that if after instituting the prosecution and twice telling the facts, once being under oath when it was a necessary part of the proceeding, and while under the restraint of a legal subpœna to tell them again, he compounded a felony in the case, it was too late for him to plead, or be to him of any avail under the humane provision of our constitution that declares that no one shall be compelled to give evidence against himself.